8 So.2d 886

### STATE v. SOUTHERN KRAFT CORPORATION.

### I Div. 161.

Supreme Court of Alabama.

May 28, 1942.

Rehearing Denied June 30, 1942.

Thos. S. Lawson, Atty. Gen., and John W. Lapsley and J. Edw. Thornton, Asst. Attys. Gen., for appellant.

McCorvey, McLeod, Turner & Rogers, of Mobile, McQueen & McQueen, of Tuscaloosa, and Benners, Burr, McKamy & Forman and Frontis H. Moore, all of Birmingham, for appellee.

BROWN, Justice.

The State Commissioner of Revenue, acting as the chief executive officer of the department of revenue [Code of 1940, Title 51, § 115], made an assessment under the Use Tax Act, approved February 28, 1939, Code of 1940, Title 51, §§ 787-811, against appellee, Southern Kraft Corporation, a body corporate, engaged in Mobile County, in the business of manufacturing Kraft pulp and Kraft paper from sap pine for resale. The basis for computing the tax is the sale and purchase price paid by appellee for salt cake, sulphur, lime, starch, hydrate of lime and chlorine, used by the appellee in the process of manufacturing said products.

The appellee protested the levy before the Commissioner of Revenue on grounds, among others, that the said materials, so purchased and used in the manufacturing of Kraft pulp and Kraft paper, "entered into and became an ingredient or component part" of said products so manufactured for resale, and said purchase was at wholesale, within the purview of said act, and therefore not subject to the use tax.

This protest was overruled by the Commission and the taxpayer appealed to the Circuit Court of Mobile County, in Equity, where an issue was made up and tried on documentary evidence, facts stipulated, and the testimony of witnesses taken ore tenus in the presence of the court, and on the issues thus presented the court stated the following conclusions of law and fact:

"The validity of the assessment depends upon the interpretation of the said Use Tax Act and more especially on the following definition of 'wholesale' therein appearing, viz.: 'The term wholesale shall include a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters into and becomes an ingredient or component part of the tangible personal property or products which he manufactures or compounds for sale, and the furnished container and label thereof.'

"Through the stipulation and the other evidence offered at the hearing, it was established without contradiction that the Southern Kraft Corporation was, during the period covered by the assessments, a manufacturer of Kraft pulp and Kraft paper for sale, and that each and every of the products listed on Exhibit 'A' to the stipulation, namely, salt cake, sulphur, lime starch, hydrate of lime and chlorine, when used in the process of manufacture adopted or used by the appellate, entered into and became an ingredient or component part of Kraft paper, this being a tangible product which the appellant manufactured for sale; that salt cake, sulphur and lime entered into and became a component part of the Kraft pulp which, according to the testimony in the cause, is a salable commodity or product manufactured for sale by the appellant. The appellant's position that the chemicals or materials above named actually entered into and became an ingredient or component part of the tangible personal property or products which it manufactured for sale, and remained a constituent or component part thereof was established by very able and convincing testimony, including that of Dr. Stewart J. Lloyd, Dean of Chemistry of the University of Alabama. The State called another eminent authority, Dr. Jack Montgomery, Professor of Chemistry at the University of Alabama, who testified that he had heard the several witnesses for the appellant testify as to the fact that the above listed materials actually entered into and became and remained a component part of the finished products which appellant manufactured for sale, namely, Kraft pulp and Kraft paper, and that the testimony of appellant's witnesses was in accord with his professional opinion.

"It was further shown by undisputed evidence that Kraft paper is distinct from other paper, and that the use of the chemicals named in Exhibit 'A' or other chemicals containing their same properties is necessary in its manufacture, and without their use Kraft paper or Kraft pulp could not be manufactured. It was further established by the evidence that if all of the said chemicals were removed from the pulp at any stage of the process before it was converted into paper, that the product which came out as paper would not be Kraft paper, and would thus lack the qualities of Kraft paper, the most important of which, under the testimony is strength and adaptability to uses to which paper other than Kraft is not adaptable. * * *

"All of the testimony in the case shows without dispute that the chemicals listed on Exhibit 'A' to the stipulation, namely, salt cake, sulphur and lime, enter into and become a component part of Kraft pulp and that at least a part of said chemicals remain there and that salt cake, sulphur, lime, starch, hydrate of lime and chlorine, the chemicals or materials listed on Exhibit 'A' to said stipulation, enter into and become a component part of Kraft paper when used in the appellant's processes of manufacture and remain there. In both instances the testimony shows that the presence of these chemicals in the finished articles is detectable by analysis.

"It is therefore the opinion of the Court that the assessments involved in this appeal were made under a misapprehension of law or fact and that said assessments in their entirety are void and should be set aside and annulled."

The stipulation of facts shows that said materials specifically enumerated in Exhibit A attached there were purchased by the appellee outside of the State of Alabama and brought into and used in Mobile County in the processes of manufacturing its products, and that no tax of any sort had been paid thereon.

The evidence further shows that pine wood is the basic material used in the manufacture of Kraft pulp and Kraft paper, 20% of which "enters into and becomes an in-

gredient or component part" of the pulp; that starch, hydrate of lime (slacked lime) and chlorine are used only in the process of converting the pulp into paper, and that a large percentage of the calcium, the combined product of hydrate of lime and chlorine, and the starch enter into and become an ingredient or component part of Kraft paper.

The evidence further shows, to state its general effect, that through the chemical reaction in the process of manufacture 6/10 of 1% of the salt cake or sodium remains as an ingredient of the pulp and goes into the paper; that 2/100 of 1% or less of the calcium, the chemical reaction of the quicklime, becomes an ingredient of the pulp, and is carried on into the paper; that 1% of the sulphur remains in the pulp and paper.

The evidence further shows that in the processes of manufacture that salt cake, sulphur and quicklime are combined in producing a cooking liquor, in which the dried chips of wood are boiled and this process of boiling eliminates the rosin and other waste leaving only the fiber, which when washed becomes pulp. After each boiling, through a recovery process, the cooking liquor, the sodium, sulphur and oxygen remaining is drained off from the lime sludge and the chemicals recovered are strengthened by adding salt cake and sulphur, and the recovered chemicals so supplemented are used again, and this process continues in the manufacture of pulp. The lime sludge so far as appears is not valuable as a by-product and becomes waste. So with the rosin.

From these facts, appellee insists that a clear inference arises that the sodium and sulphur and a considerable percentage of the quicklime are never lost, but by repeated processes all or a major portion of these materials ultimately become an ingredient or component part of the finished product.

It is conceded in argument that the use of starch in the process of manufacture, 80% of which adheres in and becomes an ingredient or component part of the paper, is not taxable under the act, and tentatively that this observation applies to the wood.

▇▇ Act Number 67 entitled "An Act to further provide for the general revenue of the State of Alabama" approved February 28, 1939, as indicated by its title and body, was enacted by the Legislature as a complement to the act levying the sales tax. The dominant legislative intent and purpose being to prevent evasion of the sales tax by purchases made out of the State and brought into the State for "storage, use or other consumption" by persons engaged in business or residing in Alabama, and is an excise imposed by the act on the person, for the privilege of such use. Act 1939, pp. 96-98, §§ 1 and 2; Code of 1940, Title 51, §§ 787, 788; Lone Star Cement Corporation et al. v. State Tax Commission et al., 234 Ala. 465, 175 So. 399.

The provisions of the act applicable to the case in hand are found in sections one and two:

"(a) An excise tax is hereby imposed on the storage, use or other consumption in this state of tangible personal property *purchased at retail* on or after the effective date of this act, for storage, use or other consumption in this state at the rate of two per cent (2%) of the *sales price* of such property. * * * Every *person* storing, using or otherwise consuming in this State tangible personal property *purchased at retail* shall be liable for the tax imposed by this act, and the liability shall not be extinguished until the tax has been paid to this State; provided, however, that a receipt from a retailer maintaining a place of business in this State or a retailer authorized by the Department, under such rules and regulations as it may prescribe, to collect the tax imposed hereby and who shall for the purposes of this act be regarded as a retailer maintaining a place of business in this State, given to the purchaser in accordance with the provisions of Section V. hereof, shall be sufficient to relieve the purchaser from further liability for a tax to which such receipt may refer." [Italics supplied.]

Section one of the act dealing with definitions of words and phrases, for the purpose of its application and enforcement, sets up arbitrary standards as to what constitutes wholesale sales and retail sales, regardless of the quantity of goods and price involved in the transaction. Said section, so far as here pertinent, provides: "(d) The term 'wholesale sale' or 'sale at wholesale' means a sale of tangible personal property by wholesalers to licensed retail merchants, jobbers, dealers, or other wholesalers for resale *and does not include a sale by wholesalers to users or consumers not for resale*. The term 'wholesale sale' shall include a sale of tangible personal property or products (*including iron ore*) to a manufacturer or compounder *which enters into and becomes an ingredient or component part of the tangible personal property or*

*products which he manufactures* or compounds for sale, and the furnished container and label thereof. (e) The term 'sale at retail' or 'retail sale' shall mean all sales of tangible personal property *except those above defined as wholesale sales. The quantities of goods sold or prices at which sold are immaterial in determining whether or not a sale is at retail.* * * * Sales of tangible personal property or products to manufacturers, quarry operators, mine operators or compounders, which are used or consumed by them in manufacturing, mining, quarrying or compounding *and do not become an ingredient or component part of the tangible personal property manufactured or compounded are retail sales."* [Italics supplied.]

The first two sections of the act clearly deal with coverage, specifying the uses which are subject to the excise, and not with uses which are exempt from the tax. That subject—exemptions—is dealt with fully in Section III, Code 1940, Tit. 51, § 789.

We have examined the many cases cited in briefs, but because of the diversity of language used in the statutes under consideration these cases shed but little light on the questions here presented. Bedford v. Colorado Fuel & Iron Corporation, 102 Colo. 538, 81 P.2d 752, 755, is inept because there the court was dealing with the provisions of the Colorado Act which omitted from the coverage "Tangible personal property *which enters into the processing of the product which is manufactured."* [Italics supplied.]

The decision in Smith Oil & Refining Company v. Department of Finance, 371 Ill. 405, 21 N.E. 2d 292, 294, is more nearly in point. The court in that case held that if the property, the use of which was taxed, was "shown to have been used with the intention that it should become a part of" the finished product, it was non-taxable. In the instant case this is shown without dispute.

Appellant's contention stated in the language of the brief is: "It is the contention of Appellant, and we believe it is supported by the weight of testimony, that the predominant purpose in the use of salt cake, sulphur, and lime (quicklime) was to use these chemicals in the cooking liquor, in the digestive or cooking process, and that the small percentage of some of these chemicals which remained in the pulp or paper should be construed as merely incidental, and not controlling. Upon a careful consideration of the testimony of the expert witnesses, it will be found that the percentages of the chemicals which remained an ingredient or component part of the finished pulp or paper are so small as compared to the total amount thereof consumed by Appellee in the manufacturing process that the maxim de minimis non curat lex would seem to be applicable, and the entire amount of such chemicals should be construed to be taxable."

The appellee's contention, on the other hand, is that the act clearly defines what, for the purposes of the act, is a "wholesale sale" and a "retail sale," that a single transaction in which the tangible personal property is acquired for use, storage or consumption can not be both a wholesale sale and a retail sale, and therefore if any part of the tangible personal property used becomes a component part of the finished product its use is not taxable; that the act does not deal in "dominant purposes" nor "percentages."

While the act does not deal in percentages, it does deal with facts in defining taxable uses and non-taxable uses, and, parenthetically, furnishes an example or illustration in specifically mentioning "Iron ore," which, as a matter of judicial knowledge, in the processes of refinement into iron and iron products, loses 49% plus of its substance in waste. 12 Enc.Brit., 14th Ed., p. 653. Therefore interpreting the act in the light of the established rule that taxing statutes are strictly construed against the taxing power and said arbitrary standards and definitions, the legislative intent apparently is that the uses of tangible personal property by a manufacturer in manufacturing articles of tangible personal property, for sale, which are used with the intent and do in fact become a substantial ingredient or component part of the finished product, are non-taxable. This interpretation is supported by the practice of the Department of Revenue in treating the use of wood, which loses 80% of its substance in the process, as non-taxable; and the concession by the State Department that the use of starch is non-taxable, though it loses 20% of its quantity in the process of manufacture. It is suggested that the words of exclusion, "becomes an ingredient or component part of the tangible personal property manufactured or compounded", should be limited to basic materials all of which become an ingredient of the manufactured or compounded product. The legislature had the right to so limit them, but it did not do so.

To adopt the "dominant purpose" thought or the percentage basis for computing the

tax would be tantamount to writing into the statute something the legislature did not, and would be judicial legislation.

This conclusion is in accordance with the view expressed in the decree of the circuit court.

Affirmed.

GARDNER, C. J., and THOMAS and FOSTER, JJ., concur.