74 So.2d 414

STATE of Alabama

v.

BEN R. GOLTSMAN & COMPANY, et al.

3 Div. 652.

Supreme Court of Alabama.

Aug. 30, 1954.

Si Garrett, Atty. Gen., H. Grady Tiller and James R. Payne, Asst. Attys. Gen., for appellant.

Rushton, Stakely & Johnston, Montgomery, for appellees.

GOODWYN, Justice.

Appeal by the state from a final decree of the Circuit Court of Montgomery County, in Equity, vacating and setting aside part of a use tax assessment made by the State Department of Revenue against appellees, herein referred to as "the taxpayers". The taxpayers are engaged in the "wine" business in Montgomery, Alabama, and contend that they are "manufacturers or compounders" of wine. The state takes the position that the taxpayers are "bottlers" of wine and not "manufacturers or compounders" within the meaning of those terms as used in Code 1940, Tit. 51, § 787(d), in defining a "wholesale sale". Section 787(d) provides as follows:

"§ 787. Definition.—The following words, terms and phrases when used in this article shall have the meaning ascribed to them in this section, except where the context indicates a different meaning: * * * (d) The term 'wholesale sales' or 'sale at wholesale' means a sale of tangible personal property by wholesalers to licensed retail merchants, jobbers, dealers, or other wholesalers for resale and does not include a sale by wholesalers to users or consumers not for resale. The term 'wholesale sale' shall include a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters into and becomes an ingredient or component part of the tangible personal property or products which he manufactures or compounds for sale, and the furnished container and label thereof. * * *"

The claimed use tax is on bottles, crowns, caps, collars, labels and fiber boxes purchased and used by the taxpayers in their wine business. There is no question raised about these articles entering into and becoming ingredient or component parts of "furnished containers and labels thereof". As presented to us, the one and only question is whether the taxpayers are "manufacturers or compounders" within the meaning of § 787(d), supra; and whether the listed articles are subject to the use tax depends upon a determination of that question. If the taxpayers are "manufacturers or compounders" then, of course, the listed articles were purchased at wholesale and are not subject to the use tax, since that tax is imposed on "the storage, use or other consumption in this state of tangible personal property purchased at retail", Code 1940, Tit. 51, § 788, as amended by Act No. 209, appvd. July 17, 1951, Gen. Acts 1951, p. 472.

The evidence was taken orally before the trial judge. Our conclusion is that it sufficiently supports the finding of the trial court that the taxpayers, during the assessment period here involved, were "manufacturers or compounders" of wine and that the listed articles were properly held to be exempt.

The taxpayers purchase, principally from California, what they contend is "crude" or "unfinished" wine which is shipped to their plant in Montgomery, Alabama, in quantity lots, usually by tank cars. On arrival, this wine is pumped from the tank cars or other receptacles, as the case may be, into large wooden vats. It is then analyzed and, based upon the analysis in each instance, there is added a certain amount of sodium bisulphite which varies from batch to batch. In addition, the taxpayers in many instances burn sulphur into the wine and also add charcoal. They also mix together in their plant different types of wine, such as port and sherry, to produce a product known as "Half-and-Half", and also mix together what they contend are "unfinished" wines of the same type but of different ages, and also mix together "un-

finished" wines of the same type but of different sections of the country. After completion of the mixing and blending procedures, the wine is then pasteurized, filtered, bottled, capped, labeled and packed in fiber boxes for sale to the Alabama Alcoholic Beverage Control Board, under the provisions of Code 1940, Tit. 29, Chapter I, §§ 1–78, as amended. When thus sold, title to the bottles, crowns, caps, collars, labels and fiber boxes passes to the Board. None of said items is returned to the taxpayers.

Testimony on behalf of the taxpayers was to the effect that the outlined procedures are necessary in order to give the wine, as it comes into the plant, the qualities or characteristics of stability and uniformity, which are necessary in order for the product to receive public approval; that these qualities are not present in the wine when received, due to the volatile nature of the unfinished wine; that, unless the outlined procedures are followed, the wine will lack uniformity in texture, taste and color, and will lack stability, that is, the ability to remain uniform over long periods of time; that the wine, in shipment, is agitated by movement of the train, causing a blur in the wine; that when the wine arrives at the plant it is pumped out into vats, which agitates the wine more; that the wine is filtered to take out anything caused by the agitation and any other particles such as dust; that the sodium bisulphite is added to hold back the bacteria and to bring it up to standard; that if this was not added, wine would not hold up, that is, it would break down on the shelf and form a cloud, a sediment in the bottle; that if sediment forms in the bottle, the product would not be salable; that charcoal is added "to reach our color", to give the wines a uniform color throughout the years; that the wine is pasteurized by bringing it up to 180 degrees Fahrenheit for the purpose of killing any bacteria that might be in it; that it is then filtered through an asbestos pressure filter to remove any foreign elements which might be in it; that the wine is then bottled and packed, using in the process the bottles, crowns, caps, collars, labels and fiber boxes here involved.

The state's insistence is that "the wine in question was wine when received" by the taxpayers; that the taxpayers are "bottlers" of wine and do not "manufacture or compound" wine within the meaning of § 787(d), supra; that use of the chemical sodium bisulphite merely acts as a "preservative" of an existing product—wine— and does not "create" anything; that the procedures followed by the taxpayers "are but merely incidents in the bottling of wine, the business in which this Company is actually engaged and which it has been licensed by the proper state authorities"; that "anything else is but an incident thereof"; that the product received by the taxpayers was wine when received and still wine when bottled; and that it could be drunk as wine when received. In this connection, we set out the following testimony of one of taxpayers' witnesses:

### Cross-Examination By State

"Q. (By Mr. Tiller.) Mr. Duffin, the wine that comes here in tank cars, is it a fact, it could be taken out and run through your filter, and could be drunk as wine? A. Yes, it could be.

"Q. And would it then be good wine? A. No, I don't believe it would.

"Q. Wouldn't it be as good as the other wine, except it would not hold up as long? A. Well, it would not have the body, and it would not have the color, and it would not have the taste.

"Q. The color doesn't add to the taste, does it? A. No, but blending the wine does.

"Q. Is it not a fact that some wines are blended when they come into Alabama? A. Some are, yes.

"Q. Some are? A. Yes.

"Q. (By The Court.) Suppose you took crude wine out of the tank, before you started to working on it, what would happen to your stomach? A. It would be all right.

"Q. You would not have the stomach ache? A. No, you might have a headache.

"Q. And you might have a headache if you drank too much of the other, would you? A. (No answer.)

"Mr. Tiller: All right. I believe that is all.

"Redirect Examination.

"Q. (By Mr. Stakely.) Another question: It would be perfectly possible for you, or your mother, or your grand-mother, to take a bunch of Niagara grapes or some other type, and make wine, would it? A. That is right.

"Q. And that wine would be drinkable wine? A. Yes.

"Q. But if you undertook to put that kind of wine in a bottle, for sale to the public, would it stand up, on the shelves? A. No, it would not.

"Q. What would happen to it? A. It would break down.

"Q. And could it, possibly, turn to vinegar? A. Yes, eventually, it might.

"Q. Would it have a mucky substance at the bottom of the container? A. Yes.

"Q. That is not the same kind of proposition as Mr. Goltsman's operation is it? A. No.

"Q. He operates on a large scale, does he? A. Yes.

"Q. And in order to have a salable product, in your opinion, that product must have stability? A. That is right.

"Q. And it must have uniformity? A. That is right.

"Q. To make customers and a demand for it, I mean? A. Yes.

"Q. And the procedures you have described are designed to produce the stability, and the uniformity? A. That is right."

From the evidence, are taxpayers "manufacturers or compounders" of wine, within the meaning of those terms as used in § 787(d), supra? To answer the question, calls for ascertainment of the meaning of those terms, and whether the legislature intended to include therein operations such as were carried on by the taxpayers. Our view is that § 787(d) "deals with coverage, not with exemptions", and that, accordingly, it should be construed strictly against the taxing power and with favor indulged toward the taxpayer. As stated in State v. Southern Kraft Corporation, 243 Ala. 223, 227, 8 So.2d 886, 889:

"The first two sections [§§ 787, 788, Tit. 51, Code 1940] of the act clearly deal with coverage, specifying the uses which are subject to the excise, and not with uses which are exempt from the tax. That subject—exemptions—is dealt with fully in Section III, Code 1940, Tit. 51, § 789."

In this connection, we approve the following from the original majority opinion in State v. Olan Mills, Inc., of Tennessee, 258 Ala. 303, 308, 63 So.2d 796, 800:

"Appellant argues that subdiv. (d), Sec. 787, Title 51, is an exemption from the use tax act and therefore should be strictly construed against the taxpayer. The contention cannot be sustained. Subdiv. (d) provides for no exemption from the sales tax. That provision deals with coverage, not with exemptions. State v. Southern Kraft Corp., supra, 243 Ala. 223, 227, 8 So.2d 886. The provision exempting uses from the tax is Sec. 789 of the title. Hence the rule of construction called for is that the stated provision of the statute is to be construed strictly against the taxing power, with favor indulged toward the taxpayer. Phenix City v. Alabama Power Co., 251 Ala. 403, 37 So.2d 515; Gotlieb v. City of Birmingham, 243 Ala. 579, 11 So.2d 363."

In the light of the foregoing rule of construction, it seems clear enough to us that the legislature did not intend to place the use tax on articles such as those here involved.

The Use Tax Act became law in 1939. One of the first cases to come before this court for construction of that Act was Curry v. Alabama Power Co., 1942, 243 Ala. 53, 8 So.2d 521, 523. There we quoted approvingly the following definition of the word "manufacture" as contained in Beggs v. Edison Electric Illuminating Co., 96 Ala. 295, 11 So. 381, 38 Am.St.Rep. 94, viz:

" 'The word "manufacture" means the making of anything by hand or artifice. Louisville & N. R. Co. v. Fulgham, 91 Ala. 555, 8 So. 803. Mr. Worcester's Dictionary defines "manufacture" as "the process of making anything by art, or of reducing materials into a form fit for use by the hand or by machinery." The definition that the word is given by the Century Dictionary is as follows: "The production of articles for use from raw or prepared materials by giving these materials new forms, qualities, properties, or combinations, whether by hand labor or by machinery." ' "

This definition of the word "manufacture" has been approved in later cases: State v. Advertiser Co., 257 Ala. 423, 428, 59 So.2d 576; State v. Try-Me Bottling Co., 257 Ala. 128, 130, 57 So.2d 537.

In applying the definition to the taxpayers, it is only necessary to determine whether they come within any of the categories included therein. The several categories are in the disjunctive and it is not required that the taxpayers come within all of them in order to qualify as "manufacturers". We are clear to the conclusion that the taxpayers produced articles for use from "prepared materials by giving the materials new * * * qualities" of uniformity and stability. Nor can there be any serious question about the "uniformity and stability" of the products being "qualities" given the "prepared materials". Web-

ster's New International Dictionary defines "uniformity" and "stability" as follows:

"Uniformity.—*Quality* or state of being uniform, or unvarying, consistent, conformed to one pattern, etc.

"Stability.—State or *quality* of being stable, or firm; strength to stand or endure without material change; steadiness; firmness; * * *." [Emphasis supplied.]

We see no need to extend the opinion further by discussing whether the taxpayers are "compounders".

The decree appealed from is affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and CLAYTON, JJ., concur.