206 So.2d 358

**STATE**

v.

**UNITED STATES STEEL CORPORATION.**

**6 Div. 395.**

Supreme Court of Alabama.

Jan. 11, 1968.

MacDonald Gallion, Atty. Gen., Willard
W. Livingston and Herbert I. Burson, Jr.,
Asst. Attys. Gen., for appellant.

Thomas, Taliaferro, Forman, Burr &
Murray, Birmingham, for appellee.

HARWOOD, Justice.

This case was tried in Circuit Court of Jefferson County, in Equity, as an appeal by the United States Steel Corporation from a final assessment of sales taxes and interest in the amount of $217,154.47. The assessment was for sales taxes asserted to be due upon sales of oxygen to United States Steel during the period 1 May 1961 through 30 April 1964. The oxygen was used in the course of manufacturing steel in the open hearth furnaces of the company at its Fairfield Works in Jefferson County, Alabama.

The basic issue in the case was whether the sales of oxygen on which the assessment was based were retail sales subject to the retail tax, or whether they were wholesale sales which were not subject to the tax.

The taxing statutes involved in this appeal are Sections 786(2) (1) (i) and

786(2) (1) (j) of Title 51 Code of Alabama 1940 (Pocket Part).

The portion of Section 786(2) (1) (i) pertinent to this review reads:

"The term 'wholesale sale' shall include a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters into and becomes an ingredient or component part of the tangible personal property or products which he manufactures or compounds for sale, and the furnished container and label thereof * * *."

The pertinent portion of Section 786(2) (1) (j) provides:

"The term 'sale at retail' or 'retail sale,' shall mean all sales of tangible personal property except those above defined as wholesale sales * * * Sales of tangible personal property or products to manufacturers, quarry operators, mine operators, or compounders, which are used or consumed by them in manufacturing, mining, quarrying or compounding and do not become an ingredient or component part of the tangible personal property manufactured or compounded are retail sales * * *."

Also involved in this review are two rules promulgated by the Department of Revenue in January 1951, as amended in August 1960.

Rule W27–151, in pertinent part, reads:

"Raw Materials and Supplies Purchased by Manufacturers and Compounders.—The ingredients and/or materials purchased by manufacturers and compounders to become a part of the property manufactured or compounded for sale are purchased at wholesale, tax free, by such manufacturers and compounders * * *."

Rule W27–171 reads:

"Ingredient or Component of Product Manufactured or Compounded for Sale.

—Any material purchased by a manufacturer which he intends to become a part of his product and which does in fact become a part thereof, even to the extent of $2/100$ of 1% or less, is purchased at wholesale, tax free. This rule, however, is not to be understood to exempt materials which do not serve any purpose after their use by the manufacturer and which do not become attached to or mixed with the other ingredients or components in such a way that they become an actual part of the product. Act No. 100, Section 1(i); Title 51 Section 786(2) (i).

"For Example:

"Detergents used in textile manufacturing and chlorine used in purifying aluminum which can be found in small amounts in the finished products where they serve no useful purpose are subject to tax.

"Softeners used in finished textiles which give the finished product a desired 'soft feel' are purchased at wholesale tax free."

After a hearing, the Chancellor entered a final decree as follows:

"Upon careful consideration, this Court is of the opinion and concludes that the Appellant has successfully met the burden resting upon it to prevail on its appeal, the Court being persuaded that the sales of oxygen to Appellant used by it in steel manufacturing were wholesale sales under the statutes and departmental rules and the governing case law inasmuch as a portion of this oxygen became an ingredient or component part of products manufactured for sale serving a useful purpose in same and being intended to remain therein.

"It is accordingly ORDERED, ADJUDGED, DECLARED AND DECREED by the Court that that certain final assessment of sales tax against Appellant, United States Steel Corporation, entered by the Department of Revenue

of Appellee, State of Alabama, on to-wit the 4th day of August 1965, in the amount of $217,154.47, inclusive of interest, be and the same hereby is vacated and set aside, same being erroneously based upon wholesale sales not subject to the sales tax, and the Appellant, United States Steel Corporation is entitled to a refund of the aforesaid amount paid by it on August 18, 1965, together with interest thereon at the rate of 6% per annum from the said date of payment until said refund is made."

From this decree the state has perfected this appeal.

The appellee manufactures steel in open hearth furnaces. In this operation it uses large quantities of lance, or pure oxygen, which is injected into the molten metal in the furnace by means of "lances" lowered through the roof of the furnace. The oxygen is blown into the molten metal under high pressure, and is dispersed throughout the molten metal.

Steel cannot be manufactured in open hearth furnaces without oxygen from some source, and prior to the use of lance oxygen it was necessary to continue adding iron ore to the molten metal in the furnace.

The primary purpose of adding oxygen is to regulate the carbon content of the steel.

All steel produced in open hearth furnaces contains some amount of oxygen, and the presence of oxygen in steel is detectable by analysis.

Slag, a by-product of the manufacture of steel in open hearth furnaces, is composed almost exclusively of various oxides, the oxides of phosphorous and manganese in the slag being the basis of its value as a fertilizer or soil conditioner. In the three years covered by the assessment, the appellee sold $3,070,000 worth of slag.

It is undisputed that a considerable quantity of oxygen remains in the slag, and that some oxygen also remains in the steel.

Some five metallurgists testified as experts in the proceedings below, four for the appellee company and one for the state. All of the witnesses are recognized as of outstanding competency in the field of metallurgy.

Mr. Robert J. King, of the Applied Science Research Laboratory of the United States Steel Corporation, stated he had observed steel making in the open hearth furnaces of the appellee in its Fairfield Works. Motion pictures of this process, including the injection of lance oxygen were received in evidence. Mr. King testified that it was the intent and purpose in injecting lance oxygen in the manufacturing process to cause the oxygen to enter into and become a component part of the molten metal, and that the oxygen was an essential raw material without which steel could not be produced.

Mr. King further testified that an experiment had been performed at the Applied Science Laboratory, under his supervision, which simulated the steel making process at appellee's works. A tracer isotope of oxygen was used to determine whether a portion of the lance oxygen remained in the finished steel. By this experiment, Mr. King determined that 1.77% of the lance oxygen remained in the steel produced in the laboratory. A detailed report of this experiment was received in evidence.

Mr. King further testified that based on his general knowledge, education, and experience, as well as the experiment he performed, it was his opinion that from $\frac{1}{10}$ of 1% to 1% of the lance oxygen used in manufacturing steel at the Fairfield Works remained in the steel as an ingredient or component part of the finished steel.

Mr. King testified that the presence of oxygen in all types of steel—rimmed,

capped, killed, and semi-killed—controls the qualities and characteristics of its ingot structure, and contributes to a degree to the strength, hardness, and smoothness of steel.

The films received in evidence also tend to establish the effect of oxygen on ingot structure, and also that the presence of the oxygen results in a greater yield of usable steel per ingot.

Mr. Clarence E. Sims was formerly Technical Director of the Battelle Memorial Institute, and is now a part-time consultant to the Institute, and also engages in independent consultation work. The Institute is the largest private research institute in the world, maintaining laboratories at several locations in this country, and in Germany and Switzerland.

Mr. Sims testified that he had personally observed the manufacture of steel in the appellee's Fairfield Works. He was personally present, and observed the experiment performed by Mr. King, and these experimental procedures were scientifically valid and the results reliable. The report of the experiment made by Mr. King and received in evidence accurately and completely described the procedures followed and the results reached.

This experiment in Mr. Sims' opinion demonstrated that a part of the lance oxygen remained in the steel, and demonstrated that a part of the oxygen remained in the steel manufactured at the Fairfield Works as an ingredient or component part. It was Mr. Sims' further opinion that from 1/10 of 1% to 1% of the lance oxygen remained in the steel manufactured at the appellee's Fairfield Works, and it was desirable to have oxygen remain in the steel, and was so intended, as steel such as rimmed and capped (the type manufactured at the Fairfield Works) does not have the machinability for many applications if the oxygen content is insufficient.

Mr. Sims further testified that from 45% to 50% of the lance oxygen used in the open hearth furnaces at the Fairfield Works remains in the slag as a component thereof, and that approximately 6% of each ton of slag so produced is lance oxygen.

Dr. C. H. T. Wilkins, head of the Metallurgical Engineering Department of the University of Alabama, testified that he had examined the report of Mr. King as to the experiment he had made, and had heard the testimony of Mr. King and Mr. Sims. In his opinion, the procedures followed in making the experiment were scientifically valid, and the standards of objective scientific inquiry were maintained, and in Dr. Wilkins' opinion, the results of the experiment were accurate and reliable.

Dr. Wilkins testified that oxygen in finished steel contributes to desirable surface characteristics of rimmed and capped steels.

Additional testimony by Dr. Wilkins was in accord with and corroborative of the testimony of Mr. King and Mr. Sims.

The remaining witness presented by the appellee was Mr. James M. Edge, Chief Metallurgist of the Fairfield Works. Mr. Edge testified that he was responsible for the quality and characteristics of the steel manufactured there, and to see that such steel was suitable for the purposes for which the customers of the Fairfield Works intended to use it.

He stated that in his opinion the lance oxygen used in the manufacturing process was intended to become a component of the steel. The additional testimony of Mr. Edge was the same as that of Mr. King, Mr. Sims, and Dr. Wilkins, though additionally he did testify that no steel pipe or tubular products are manufactured at the Fairfield Works.

The only witness presented by the state was Mr. E. C. Wright, Professor Emeritus of Metallurgical Engineering at the University of Alabama.

We find nothing in Mr. Wright's testimony contradictory of the testimony of the appellee's witnesses. He was in full accord with the testimony of appellee's witnesses that oxygen is one of the basic ingredients in producing steel in open hearth furnaces; that in his judgment, a small portion of the lance oxygen remained in the finished steel, and in the type of steel manufactured at the Fairfield Works, oxygen is necessary to develop the rimming action in rimmed steel, and the capping action in capped steel.

Mr. Wright further testified that when he was employed by the National Tube Company, it had been found that failures in steel pipes which had been used under high pressure were due to the oxygen content, and it was the desire of that company at that time to remove oxygen from the steel used in their tubular products. However, the products of the National Tube Company differed "quite a bit" from the products manufactured at appellee's Fairfield Works.

As we understand the argument of counsel for the appellant, it is to the effect that since it is desirable to remove oxygen from certain types of steel (that used in tubular products) then it is desirable to remove oxygen from all types of steel, and therefore no benefit is afforded steel by leaving in any oxygen, and no useful purpose is served thereby.

Counsel interprets State v. Southern Kraft Corp., 243 Ala. 223, 8 So.2d 886, as requiring that for a product used in manufacturing, a small part of which remains in the finished product, to be within the purview of Section 786(2) (1) (i) which defines a wholesale sale, it must be shown that the product was so used with the intent that it become a component of the finished product, and one method of demonstrating this intent is by showing that a benefit is conferred upon the finished product.

Neither Section 786(2) (1) (i), nor 786(2) (1) (j) specify that a product used in manufacturing a finished product must be used with the intent that it become a component of the finished product, or be beneficial, but only that the product used in manufacture "enters into and becomes an ingredient or component part" of the finished product. (Section 786(2) (1) (i).

Nor do Department of Revenue Rules W27–151 and W27–171, require that the product used in the manufacturing process be beneficial, though Rule W27–171 states that the used product must be intended by the manufacturer to become a part of the finished product, and in fact does become a part thereof "even to the extent of 2/100 of 1% or less, is purchased at wholesale, tax free."

In *Kraft*, supra, the tax had been assessed on certain chemicals going into the manufacture of Kraft paper. The evidence showed that through chemical reaction in the manufacture of the paper 9/10 of 1% of the sodium, 2/100 of 1% or less of the calcium, and 1% of the sulphur remained in the finished paper. The lower court held that the assessments of the use tax on all the chemicals used in the paper manufacturing process were made under a misapprehension of the law and the facts, and therefore were void and should be annulled.

On appeal the judgment of the lower court was affirmed, this court stating that the provisions of the act applicable set up arbitrary standards as to what constituted wholesale sales and retail sales, regardless of the quantity of goods and prices involved, and the standard for a whole sale sale was whether the product sought to be taxed entered into and became an ingredient or component of the finished product. The court further observed:

"To adopt the 'dominant purpose' thought or the percentage basis for computing the tax would be tantamount to writing into the statute something the legislature did not, and would be judicial legislation."

It is true that in *Kraft,* supra, this court stated:

"The decision in Smith Oil & Refining Company v. Department of Finance, 371 Ill. 405, 21 N.E.2d 292, 294, is more nearly in point. The court in that case held that if the property, the use of which was taxed, was 'shown to have been used with the intention that it should become a part of' the finished product, it was non-taxable. In the instant case this is shown without dispute."

It is from this quotation of the Illinois case that counsel for the state bases his argument that the product added in the course of manufacture and which remains in some part in the finished article must have been added both with the intention that it become a part of the finished product, and beneficial. We find nothing in *Kraft,* supra, nor in the applicable statutes, nor in the Rules of the Department of Revenue to the effect that the added product must be beneficial, and counsel for appellee argues further that the state's contention that the addition of the product must be intentional is only dictum, since not required by the statute.

No need arises to pass on this contention since there is an abundance of evidence to the effect that the lance oxygen is essential to the manufacture of the type of steel produced in the open hearth furnaces of appellee's works, that a portion of the oxygen remains in the finished steel (a percentage many fold greater than the $\frac{3}{100}$ of 1% of the calicum considered as adequate in *Kraft*) and that the oxygen component was beneficial and desirable in the steel so produced in light of the uses to be made thereof by the appellee's customers.

The decree of the lower court is due to be affirmed, and it is so ordered.

Affirmed.

SIMPSON, MERRILL and COLEMAN, JJ., concur.