361 So.2d 1070 (1978)
ROBERTSON & ASSOCIATES (ALABAMA), INC.
v.
Charles A. BOSWELL, Commissioner of Revenue, State of Alabama.
Charles A. BOSWELL, Commissioner of Revenue, State of Alabama
v.
ROBERTSON & ASSOCIATES (ALABAMA), INC.
77-7, 77-8.
Supreme Court of Alabama.
September 8, 1978.
*1071 Joe M. Dawson of Dawson & McGinty, Scottsboro; Thomas O. Helton, Carl E. Hartley, Brian P. Mickles, of Stophel, Caldwell & Heggie, Chattanooga, Tenn., for appellant and cross-appellee.
William J. Baxley, Atty. Gen., State of Ala., Herbert I. Burson, Jr., Counsel, Dept. *1072 of Revenue and Asst. Atty. Gen., State of Ala., B. Frank Loeb, Asst. Counsel, Dept. of Revenue, and Asst. Atty. Gen., State of Ala., for appellee and cross-appellant.
JONES, Justice.
This appeal and cross-appeal is from a final decree of the Jackson County Circuit Court granting in part and denying in part a refund of state and local sales and use taxes which had been paid by Robertson & Associates (Alabama), Inc., Appellant and Cross-Appellee. We affirm as to the appeal and cross-appeal.
Robertson, an Alabama corporation, has a coal mining operation in Jackson County, Alabama. Following an audit of its records in 1975, Charles A. Boswell, Commissioner of Revenue, Appellee and Cross-Appellant, assessed the sales and use taxes at issue against the following items used by Robertson in its mining operation:
(1) ammonium nitratepurchased for use as an explosive for blasting;
(2) gravelpurchased for use as roadbeds around the mining site; and
(3) fuel and other suppliespurchased for the maintenance of a truck used to spray water on the roads to and from the mining pit.
Following a hearing and submission of briefs by the parties, the trial Court entered its order on July 22, 1977, finding as follows:
(1) The purchase of ammonium nitrate is not a tax exempt purchase at wholesale under Tit. 51, § 786(2)(i), Code[1], because Robertson failed to meet its burden of proving that any part of the ammonium nitrate entered into and became an ingredient or component part of the end product, coal. However, the purchase of the chemical is to be taxed at the reduced state sales and use tax rates provided in Tit. 51, § 786(3)(c), Code[2], and the reduced Jackson County rates, as a purchase of a machine, part or attachment thereto, used in a mining operation.
(2) Gravel purchased for use as roadbeds is not a machine, part or attachment thereto, within the meaning of Tit. 51, § 786(3)(c), Code, and is thus subject to the state sales and use tax rate of four percent and the Jackson County sales and use tax rate of one percent.
(3) Fuel and supplies used to maintain the water truck are not component parts of an anti-pollution device and are not subject to a tax exemption under Tit. 51, § 786(34)(n), Code.[3] Such fuel and supplies are therefore to be taxed at the state sales and use tax rate of four percent and the Jackson County sales and use tax rate of one percent.

On the Appeal
Robertson first contends that its purchase of ammonium nitrate is exempt from sales and use taxes as a purchase at "wholesale." We disagree.
Tit. 51, § 786(2)(i), Code, provides, inter alia:
The term "wholesale sale" or "sale at wholesale" means . . . a sale of tangible personal property or products (including iron ore) to a manufacturer or compounder which enters [enter] into and becomes [become] an ingredient or component part of the tangible personal property or products which such manufacturer or compounder manufactures or compounds for sale, and the furnished container and label thereof. . . .
Because of the wording of this statute, the threshold problem is to determine whether Tit. 51, § 786(2)(i), applies to sales made to Robertson. The statute specifically refers to sales of tangible personal property or products to a "manufacturer or compounder," and does not mention quarry or mine operators. We find, however, that Tit. 51, § 786(2)(i) may be applicable to sales to Robertson, a mine operator, because Tit. *1073 51, § 786(2)(j), Code[4], is a companion statute and reads in pertinent part:
The term "a sale at retail" or "retail sale" shall mean all sales of tangible personal property except those defined as wholesale sales . . . . Sales of tangible personal property or products to manufacturers, quarry operators, mine operators, or compounders, which are used or consumed by them in manufacturing, mining, quarrying or compounding and do not become an ingredient or component part of the tangible personal property manufactured or compounded are retail sales.
Unlike § 786(2)(i), § 786(2)(j) specifically includes quarry and mine operators. Thus, having determined that Tit. 51, § 786(2)(i), applies to mine operators such as Robertson, we now must decide whether the ammonium nitrate in the present case was purchased in "wholesale sales" and is, therefore, tax exempt.
Double taxation has become a common phenomenon in our overtaxed society; but the statute here under consideration is a genuine, well-intended effort of our legislature to prevent an otherwise double-taxation situation. It is a reasonable, welldrafted Act whose purpose is clear and whose application should pose no practical difficulty. In simple paraphrase, the statute provides that a taxpayer who manufactures or compounds a product for retail sales will not be charged sales tax on the individual items that make up the ingredients or component parts of the finished product; and this for the reason that the sales tax will be collected upon the ultimate retail sale of the finished product.
The explosive, ammonium nitrate and diesel fuel, is used to remove or loosen the cover (called overburden) from the seam of coal. It is the preparatory means of recovery of the mineralnot an ingredient or component part of the finished product as contemplated by the statute. (This is true even though small traces of the chemical may be found in the finished product the coal.)
The cases of State v. United States Steel Corp., 281 Ala. 553, 206 So.2d 358 (1968), and Boswell v. Abex Corp., 55 Ala.App. 477, 317 So.2d 314 (1975), correctly apply the express intent of the Act. In United States Steel, lance (pure) oxygen was essential to the manufacture of open hearth steel and became an intentional ingredient of the finished product. In Abex the material (carbon electrodes) was used for the dual purpose of providing heat and carbon as an essential ingredient in the manufacture of steel railroad wheels. Neither the open hearth steel in United States Steel nor the steel wheels in Abex would have been the same product apart from the materials which were the subject matter of the tax dispute.
This is not to reject the dictum in United States Steel to the effect that it is not necessary to qualify as a wholesale sale that the added material be beneficial to the finished product. Certainly, this test, aside from its omission from the statute, is too subjective for practical application. Its difficulty of operative effect readily can be seen in the question: "Beneficial from whose point of view?" It is not irrelevant in seeking to execute the intent and purpose of the statute, however, to look to the purpose for which the material was used. The question is not whether the product was in fact made better by its addition to the finished product. Rather, the test is whether the manufacturer (here the mine operator) used the material (the explosive) with the intent and purpose of making it an ingredient or component part of the mined coal; or, conversely, was its presence in the finished product merely incidental to its primary function.
Admittedly, there is no hard and fast rule that could definitively answer every fact situation, and the standard necessarily will have to be applied on a case-by-case basis. Here, the coal operator used the explosives for the sole purpose of removing or loosening the overburden (the dirt and rock above the coal seam). Strip mining, as the very *1074 term implies, is dependent for its operation upon the uncovering of the seam of coal to be mined. The explosive material, which is the subject of this tax dispute, is the means, or one of the means, of exposing the commercial material for mining and ultimate sale. Merely because, as an incident of proximity, microscopic particles of water vapor (moisture) and "other gases" from the explosive are chemically traceable in the mined coal does not meet the test of "wholesale sales" as that term is defined by the statute. To allow the purchase of these explosive materials to be classified as "wholesale sales" contravenes the legislative intent to prevent double taxation; instead, such interpretation avoids the tax altogether.
Robertson secondly contends that gravel purchased by it for use as roadbeds from the mining site to the preparation plant is a machine, or attachment thereto, used in mining operations and subject to the lower sales and use tax rates provided for such machines in Tit. 51, § 786(3)(c), Code. The lower Court found this claim to be without merit, and we agree.
"The term `machines, attachments and replacements' in this connection have been given a broad meaning. . . . Their status is not controlled by the material of which they are composed, but by the office they serve in the process. If the article in question performs an integral function in the procedure by which the tangible personal property is produced, we think it is a part and parcel of the machinery used in its production. . . .
"On the other hand, if a product, such as grease or fuel is useful only as an aid, though vital in enabling the machine or some part of it to operate, but not itself performing a distinct function in the operation, it does not come within the exception." State v. Newbury Manufacturing Co., 265 Ala. 600, 603, 93 So.2d 400, 402 (1957).
From the evidence presented at trial, it is clear that the gravel purchased by Robertson does not perform an integral, distinct function in Robertson's operation of extracting and processing coal. Mr. Morrell testified that coal is transported from the mining site to the plant by heavy coal carriers. A special type and size gravel is purchased by Robertson in order to form safe, usable roadbeds for the coal carriers. Thus, the gravel serves merely as an aid, albeit vital, to the coal carriers, enabling these machines to operate. As such, the gravel fails to qualify for the reduced tax rates in Tit. 51, § 786(3)(c), Code.
Robertson lastly asserts that certain fuel and supplies purchased for maintenance of its water truck were acquired primarily for the control, reduction or elimination of air pollution (dust) and are therefore exempt from sales and use taxes under Tit. 51, § 786(34)(n), Code, which provides in pertinent part:
There are exempted from the provisions of this article and from the computation of the amount of the tax levied, assessed or payable under this article the following:
. . . . .
(n) The gross proceeds from the sale of all devices or facilities (and all identifiable components thereof or materials for use therein) acquired primarily for the control, reduction or elimination of air or water pollution and the gross proceeds from the sale of all identifiable components of or materials used or intended for use in structures built primarily for the control, reduction or elimination of air and water pollution.
We again agree with the trial Court that this contention is without merit. Our review of the testimony of Mr. Morrell, relied upon by Robertson as support for its position, indicates that this truck is not used "primarily" for the control of air pollution, but is used for the maintenance of the roadbeds surrounding the mining sites. The fuel and other supplies used to maintain this truck are therefore not components or materials used in an anti-pollution device within the meaning of § 786(34)(n).

*1075 On the Cross-Appeal

The Commissioner claims error in the finding below ordering a refund based on the reduced rates applicable to "purchase of a machine, part or attachment thereto, used in a mining operation." We view this issue as much more difficult than those addressed on the appeal. At first blush, it hardly seems likely that the legislature could have contemplated a sack of fertilizer and a drum of diesel fuel as a "machine" for purposes of qualifying for the reduced rate of taxes. But, as we have seen in Newbury Manufacturing Co., our inquiry cannot be as superficial as our "first blush" reaction. The office they serve, and not the material of which they are made, controls their status.
Indeed, the very rationale by which we reject Robertson's claim of wholesale sales supports the mine operator's alternative contention that the explosive materials fit the statutory definition of machine: "It is the preparatory means of recovery of the mineralnot an ingredient or component part of the finished product as contemplated by the statute." Basically, then, two separate means generally are employed in producing coal by strip miningexplosives and earth-moving equipment. Under the "offices used" test, both equally qualify for the reduced tax rate.
Accordingly, the judgment of the trial Court is affirmed.
AFFIRMED.
BLOODWORTH, MADDOX, FAULKNER, ALMON, EMBRY and BEATTY, JJ., concur.
TORBERT, C. J., and SHORES, J., dissent.
TORBERT, Chief Justice (concurring in part; dissenting in part):
I believe the majority to be correct in affirming the trial court with regards to the taxable status of both the gravel purchased by Robertson for use as roadbeds around the mining site and the fuel and other supplies purchased for maintenance of Robertson's water truck. However, I must respectfully disagree with the majority's holding concerning the assessment of sales and use taxes against the ammonium nitrate purchased by Robertson.
A review of the record in this case shows the various stages of Robertson's mining operation in Jackson County to be as follows: clearing the land; drilling and blasting for coal; loading and hauling the coal to a preparation plant; processing the coal; and selling the coal to T.V.A. According to Mr. Willard L. Morrell, who is in charge of production at the Jackson County mine, the ammonium nitrate is used by Robertson in the blasting stage. Fifty pounds of the high explosive is placed in a blast hole, which has previously been drilled in the ground to a point approximately one to three feet above a coal seam. One pound of explosive cast primer is added. Approximately two-thirds of the remaining space in the blast hole is filled with a compound which is ninety-four percent ammonium nitrate and six percent diesel fuel and the remaining one-third of the blast hole is filled with earth.
Mr. Morrell stated that upon explosion of the ammonium nitrate mixture a chemical reaction takes place in which the ammonium nitrate is converted into nitrogen, carbon dioxide, and water vapor. Robertson's two expert witnesses, Professor Wayne O. Ursenbach, associate with the University of Utah Research Institute, and Dr. Alan Bauer, head of the Department of Mining Engineering at Queen's University in Kingston, Ontario, verified Mr. Morrell's testimony concerning this chemical reaction upon explosion. Both experts, who are explosive specialists, testified that the pressure created by the explosion of the ammonium nitrate causes a pulverization or breaking effect on the coal seam. Water vapor and the other gases created by the explosion are driven into the pores of the coal and remain in the coal until it is burned. Mr. Ursenbach and Dr. Bauer both stated that the water vapor and other gases created by the explosion would not be forced out of the coal after the completion *1076 of the explosion process because coal has a relatively high propensity to absorb gases.
The only witness presented by the Commissioner was Professor Reynold Shotts, Professor of Mineral Engineering at the University of Alabama, who admitted that both of Robertson's experts were explosive specialists and that he was not. On crossexamination Professor Shotts further admitted that gases created by the explosion would enter the coal seam and that some of the water vapor and gases might enter the coal, but he could neither prove nor disprove that the gases formed by the explosion would definitely enter the coal.
In State v. United States Steel Corporation, 281 Ala. 553, 558, 206 So.2d 358, 362-63 (1968), a decision relied upon heavily by Robertson as support for its position on this issue, and noted by the majority, this court stated the following:
"Neither Section 786(2)(1)(i), nor 786(2)(1)(j) specify that a product used in manufacturing a finished product must be used with the intent that it become a component of the finished product, or be beneficial, but only that the product used in manufacture `enters into and becomes an ingredient or component part' of the finished product. (Section 786(a)(1)(i)."
In Boswell v. Abex Corporation, 55 Ala. App. 477, 479, 317 So.2d 314, 316, cert. denied, 294 Ala. 334, 317 So.2d 317 (1975), the second decision cited by the majority on this issue, the following is stated concerning the taxing statutes involved in this appeal:
"The U.S. Steel case relied on the Supreme Court's earlier decision in State v. Southern Kraft, 243 Ala. 223, 8 So.2d 886 that the tax statute defined wholesale sales and retail sales without regard to the quantity of the tangible personal property which entered into or became an ingredient or component part of the finished product. Indeed, 2/100 of 1 percent was precisely that part of the chemical purchased in the Southern Kraft case which became an ingredient of the finished product. . . .'"
Thus, applying the statute and previous decisions of the courts in this state to the testimony of all witnesses presented at trial, I cannot agree with the majority that the trial court correctly held that Robertson failed to prove that any part of the ammonium nitrate became an ingredient in the end product, coal. To the contrary, I find that the testimony of Robertson's witnesses, which is virtually uncontradicted by any testimony of Commissioner Boswell's single witness, proves that water vapor and other gaseous byproducts of the explosion of ammonium nitrate enter the coal and become an "ingredient" thereof. I would therefore hold that the ammonium nitrate was purchased in "wholesale sales" within the meaning of Title 51, section 786(2)(i) and is exempt from sales and use taxes.
Accordingly, I necessarily would reverse the trial court's ruling that the ammonium nitrate is subject to sales and use taxes under Title 51, section 786(3)(c), Code of Alabama 1940 (§ 40-23-2(3), Code 1975), as a purchase of a machine, part or attachment thereto.
SHORES, J., concurs.
NOTES
[1] § 40-23-1(a)(9)(b), Code 1975.
[2] § 40-23-2(3), Code 1975.
[3] § 40-23-4(16), Code 1975.
[4] § 40-23-1(a)(10), Code 1975.