THE HENRY PERKINS COMPANY *vs.* BOARD OF ASSESSORS
OF BRIDGEWATER.

Suffolk. December 6, 1978. — January 17, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Taxation,* Real estate tax: exemption. *Environmental Affairs.*

A facility constructed by a manufacturer of metal castings to house a
   changed process of manufacture, introduced with a view to improv-
   ing the control of pollution, was not exempt from tax as a property
   installed for the purpose of eliminating industrial waste and there-
   by reducing atmospheric pollution within the meaning of G. L.
   c. 59, § 5, Forty-fourth. [119-122]

APPEAL from a decision of the Appellate Tax Board.
The case was submitted on briefs.
*Cortland A. Mathers* for the taxpayer.
*Robert G. Clark, III,* Town Counsel, for the Board of
Assessors of Bridgewater.

KAPLAN, J. We review a decision of the Appellate Tax
Board (Board) which, on a taxpayer's appeal pursuant to
the "formal" procedure (G. L. c. 58A, § 7), upheld the
board of assessors of the town of Bridgewater in its refus-
al to abate an assessment of property taxes for a one and
one-half year period (January 1, 1974-June 30, 1975) on
a certain building owned by the taxpayer. The claim for
abatement went on the ground that the building was
exempt from tax as a property installed for the purpose
of eliminating industrial waste and thereby reducing at-
mospheric pollution within the meaning of G. L. c. 59, § 5,
Forty-fourth.

1. The facts drawn from the Board's "Findings of Fact
and Report" are in substance as follows. The Henry Per-
kins Company, taxpayer and appellant here, had long

been a manufacturer of metal castings. Before the issue of air pollution arose, the company melted scrap iron and steel by means of a furnace using coke (called an "iron-melting cupola" operation). Scrap was dumped in an open area near the furnace and manually loaded into it. Any grease, paint, moisture, or impurities in the scrap were burned out and when emitted into the air were realized as fumes, smoke, and similar offensive products.

In 1972 the Department of Public Health notified the company that it was not complying with emission limitations set out in regulations for control of air pollution in the control district of metropolitan Boston. The company submitted plans for construction of a new facility for melting scrap; these were provisionally approved by the department; construction went forward; and in 1974 the company received notices from the director of the air pollution control district and the Department of Public Health that the finished facility had achieved compliance.[1]

The central element of the new facility, which supplanted the old, was an electric induction furnace with an overhead crane for handling the scrap. A new building, of steel frame construction with a floor of reinforced concrete, housed the furnace and ancillary equipment, including, besides the crane, a furnace control panel and cabinet, a hydraulic system to tilt the furnace for pouring, a cooling tower, and an emergency generator. Floor area of the building was 6,000 square feet, of which 3,900 square feet were heated. Several bins within the building were used to store the alloys introduced for melting. As only dry scrap could be safely loaded into the furnace—wet scrap could cause an explosion—the scrap was stored in the heated area and dried and handled there.

---

[1] We find no statement by the Board that the procedure of the third paragraph of the clause was followed (see note 2 *infra*), but no point has been made of this.

The new facility was expected to eliminate any undue pollution since only "clean" scrap was to be utilized and the furnace ran by electric power without noxious combustion products. Whereas the former operation melted scrap at the ráte of three tons per hour, the new rate would apparently be 2.5 tons. The Board did not report on comparisons of cost or the like.

Exemption under the forty-fourth clause was sought only for the new building (its uncontested assessed valuation was $64,000); like exemption was not claimed for the furnace or related equipment, probably because this property was exempted as machinery of a manufacturing company under G. L. c. 59, § 5, Sixteenth.

2. The Board had to answer the question whether a building newly constructed to house or support a changed process of manufacture, introduced with a view to improving the control of pollution, was property which fell within the exemption of the forty-fourth clause. We turn to the text, set out in full in the margin.[2] The Board's

---

[2] General Laws c. 59, § 5, Forty-fourth, as appearing in St. 1972, c. 707, § 2, read as follows: "Forty-fourth. Any structure, building, device, appliance, machinery, equipment or other property, whether consisting of real or tangible personal property, or a combination of both, which is constructed, installed or placed in operation, in whole or in part, for the purpose of eliminating industrial waste or reducing such waste to a level of toxicity that is not injurious to fish, fowl, animal life or aquatic vegetation and thereby abating or preventing the pollution of the waters of the commonwealth or for the purpose of abating, preventing or eliminating industrial pollution of the atmosphere of the commonwealth. This exemption shall apply to facilities for the treatment, neutralization or stabilization of industrial waste or industrial air pollution from a point immediately preceding the point of such treatment, neutralization or stabilization to the point of disposal, including the necessary pumping and transmitting facilities, but excluding such facilities installed for the primary purpose of salvaging materials which are usable in the manufacturing process or are marketable. The term 'industrial waste' and the term 'industrial air pollution', as used in this section, shall mean any liquid, gaseous, solid or waste substance, or a combination thereof, resulting from any process of industry, manufacture, trade or business or from the development or recovery of any natural resources, which may cause or might reasonably be expected to cause pollution of the waters or the

"Opinion" in effect took the first sentence, "[a]ny . . . building . . . which is constructed, installed or placed in operation, in whole or in part, for the purpose of eliminating industrial waste" (and so forth), as requiring that the purpose be exclusively, or perhaps to a dominating degree,[3] the environmental one—purpose being seen in terms of the function of the building rather than the taxpayer's motivation in constructing it. Here the requirement was not fulfilled because the purpose or dominating purpose of the new building, as of the whole new facility, was to manufacture metal castings.[4] The expres-

---

atmosphere of the commonwealth.

"If any such structure, building, device, appliance, machinery, equipment or other property is used solely and in its entirety for the elimination or control of water or air pollution, the exemption granted hereunder shall be total; if, however, only a portion of such structure, building, device, appliance, machinery, equipment or other property is used for the elimination or control of water or air pollution, the exemption shall be prorated as follows: for structures and buildings, the ratio which the area or volume, as applicable, thereof used solely for pollution control bears to the entire area or volume; for devices, appliances, machinery, equipment or other property, the ratio which the operating time devoted solely to pollution control bears to the total operating time.

"No exemption shall be granted under this clause unless the director of the division of water pollution control in the department of natural resources or the director of the air pollution control agency in the commonwealth, as the case may be, certifies to the assessors of the city or town involved that such structure, building, device, appliance, machinery, equipment or other property is effective in eliminating or reducing pollution to an acceptable level."

(A minor amendment by St. 1975, c. 706, § 113, is immaterial to the present case.)

[3] Compare the effort to define "manufacturing corporation" in *Fernandes Super Mkts., Inc.* v. *State Tax Comm'n*, 371 Mass. 318, 322 (1976). See also *OEA Senior Citizens, Inc.* v. *County of Douglas*, 186 Neb. 593, 598-599 (1971).

Like the Board, we have examined the legislative history of the forty-fourth clause without particular benefit.

[4] For comparable approaches under variant incentive tax provisions for environmental improvements, see *Robertson & Assocs. (Ala.), Inc.* v. *Boswell*, 361 So. 2d 1070, 1074 (Ala. 1978); *Heller* v. *Fergus Ford, Inc.*, 59 Ill. 2d 576 (1975), aff'g 15 Ill. App. 3d 868 (1973), followed in

sion "in whole or in part" referred not to "the purpose" but to the property, and in the present case no part of the building (or, for that matter, of the entire new facility) had the requisite purpose. This interpretation was consistent with the second paragraph of the clause where it speaks of "used solely and in its entirety for the elimination"; "used solely for pollution control"; and "devoted solely to pollution control." (See also the reference to "primary purpose" in the second sentence of the first paragraph.) Concluding its "Opinion," the Board put and answered a question which it conceived to be much the same as that posed by the present case: "If a manufacturer of metal castings interested in a new location for establishing a plant which will be in conformity with the emission standards [of the relevant regulation] finds a suitable location, constructs a building and installs therein an electric induction furnace for melting scrap iron, would the building be eligible for exemption under cl. 44 as a 'building . . . which is constructed . . . in whole or in part, for the *purpose* of eliminating industrial waste or reducing such waste . . .'? (emphasis supplied). We think not."

The Board's interpretation of the statute, leading to its decision in the instant case, cannot be shown to be correct with the intellectual satisfaction that comes of a mathematical proof, but it is well within the text and is a reasonable reading. We attach some significance to the fact that the Board as a State agency charged with administration of the law supports the interpretation,[5] and

---

*Wexler* v. *Sears, Roebuck & Co.*, 58 Ill. App. 3d 490 (1978); *Du-Mont Ventilating Co.* v. *Department of Revenue*, 52 Ill. App. 3d 59 (1977); *Illinois Cereal Mills, Inc.* v. *Department of Revenue*, 37 Ill. App. 3d 379 (1976); *Statler Industries, Inc.* v. *Board of Environmental Protection*, 333 A.2d 703 (Me. 1975) (compare *Ethyl Corp.* v. *Adams*, 375 A.2d 1065 [Me. 1977]). Cf. *Covert Township Assessor* v. *State Tax Comm'n*, 77 Mich. App. 626 (1977); *Meijer, Inc.* v. *State Tax Comm'n*, 66 Mich. App. 280 (1975); *Transue & Williams* v. *Lindley*, 54 Ohio St. 2d 351 (1978). See generally Annot., 65 A. L. R. 3d 434 (1975).

[5] See *Ace Heating Serv., Inc.* v. *State Tax Comm'n*, 371 Mass. 254, 255-256 (1976).

to the further fact that we deal here with a clause which exempts from tax and thus is to be construed without particular generosity toward taxpayers.[6]

It has not escaped our notice that the interpretation adopted has a tendency to favor the exemption of equipment or other property "tacked on" to existing machines or structures with the single purpose and effect of reducing the pollution otherwise caused, while it disfavors the exemption of construction embodying a process which as an integrated whole produces less pollution than other models.[7] This may be questionable as a matter of social policy, but the tax authorities could decide, with reason, that before proceeding to grant full exemption to a multipurposed structure, or to attempt to scale the exemption to the relative strength of the antipollutant purpose,[8] they should await a clearer legislative direction than could be found in the forty-fourth clause as now phrased. A proper debate about the desirable scope of a property exemption would not only consider the related tax provisions,[9] but also search deeply into the theory of the tax exemptions and other subsidies intended to encourage improvements of the physical environment.[10]

*Decision of the Appellate Tax Board affirmed.*

[6] See *Mahony* v. *Assessors of Watertown*, 362 Mass. 210, 214 (1972). Cf. *Fernandes Super Mkts., Inc.* v. *State Tax Comm'n*, 371 Mass. 318, 319 (1976); *Ace Heating Serv., Inc.* v. *State Tax Comm'n*, 371 Mass. 254, 255-256 (1976).

[7] See *Weyerhaeuser Co.* v. *Department of Ecology*, 86 Wash. 2d 310, 318-319 (1976); Reitze & Reitze, Tax Incentives Don't Stop Pollution, 57 A. B. A. J. 127, 129 (1971).

[8] In fact the present appellant argued for full, not partial, exemption of the property.

[9] See G. L. c. 63, § 38D (elective deduction and exemption for construction or improvement of industrial waste treatment or air pollution control facilities); I. R. C. § 169 (amortization of pollution control facilities), and regulations of the Internal Revenue Service and the Environmental Protection Agency, 26 C. F. R. §§ 1.169-1.169-4, 40 C. F. R. §§ 20.1-20.10.

[10] See R. E. Stewart & J.E. Krier, Environmental Law and Policy 560-564 (1978); F.R. Anderson et al., Environmental Improvement

Through Economic Incentives 18-20 (1977); Reitze & Reitze, *supra* note 7; Avins, Tax Incentives and Pollution: The Need for Hysteria Control, 58 A.B.A.J. 54 (1972). See generally Surrey, Tax Incentives as a Device for Implementing Government Policy: A Comparison with Direct Government Expenditures, 83 Harv. L. Rev. 705 (1970).