**ETHYL CORPORATION**

v.

**William R. ADAMS, Jr., et al., in their capacity as Board of Environmental Protection, etc.**

Supreme Judicial Court of Maine.

June 24, 1977.

Whiting & Kendall, by Richard E. Whiting, James H. Kendall, Rumford, for plaintiff.

John M. R. Paterson, Asst. Atty. Gen., Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DELAHANTY, Justice.

This case originated when the Board of Environmental Protection (Board)[1] denied two applications submitted by Ethyl Corporation (Ethyl) for certification of a newly installed "bark-oil boiler" at Ethyl's Oxford Paper Company[2] plant in Rumford as a "water and air pollution control facility" for tax exemption purposes. Ethyl appealed to the Superior Court, which reversed the Board's decisions and order that the boiler be certified as Ethyl had requested. The Board has appealed that judgment to this Court. We sustain the appeal.

In 1972, as a prerequisite to obtaining an exemption from sales and use taxes, Ethyl applied, pursuant to 36 M.R.S.A. § 1760(29, 30)[3] to the Board for certification of its

---

1. Prior to July 1, 1972, the Board of Environmental Protection was known as the "Environmental Improvement Commission." On that date, P.L. 1972, ch. 618 became effective. Section 12 of that Act provides,

Wherever in the Revised Statutes the words "Environmental Improvement Commission" appear, they shall mean the Board of Environmental Protection.

2. Oxford Paper Company is a division of Ethyl Corporation.

3. 36 M.R.S.A. § 1760. *Exemptions* [prior to amendments effective October 3, 1973].

No tax on sales, storage or use shall be collected upon or in connection with:

\* \* \* \* \* \*

29. *Water pollution control facilities.* Sales of any water pollution control facility, certified as such by the Environmental Improvement Commission, and any part or accessories thereof, or any materials for the construction, repair or maintenance of such facility.

As used in this subsection:

A. "Disposal system" means system used primarily for disposing of or isolating industrial waste and includes thickeners, incinerators, pipelines or conduits, pumping stations, force mains, and all other constructions, devices, appurtenances and facilities used for collecting or conducting water borne industrial waste to a point of disposal, treatment or isolation, except that which is necessary to the manufacture of products.

B. "Facility" means any disposal system or any treatment works, appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial waste.

C. "Industrial waste" means any liquid, gaseous or solid waste substance capable of polluting the waters of the State and resulting from any process, or the development of any process, of industry or manufacture.

boiler as a water and air pollution control facility. On June 20, 1973, the Board, acting without a hearing, declined to so certify the boiler, and Ethyl was notified of this determination in a letter from a Board staff member.[4] No record was made of the Board's proceedings on the application. Ethyl promptly initiated judicial review of the denial of its application under authority of 38 M.R.S.A. § 415 [5] and M.R.Civ.P. 80B [6]

> D. "Treatment works" means any plant, pumping station, reservoir or other works used primarily for the purpose of treating, stabilizing, isolating or holding industrial waste.
> 30. *Air pollution control facilities.* Sale of any air pollution control facility, certified as such by the Environmental Improvement Commission, and any part or accessories thereof, or any materials for the construction, repair or maintenance thereof.
> As used in this subsection:
> A. "Facility" means any appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling, eliminating or disposing of industrial air pollutants.
>     *    *    *    *    *    *

4. The letter was written on Department of Environmental Protection stationery and reads as follows:

June 29, 1973
Stuart R. Cooper, Director
Pollution Abatement
Ethyl Corporation
Oxford Paper Co. Div.
Rumford, Maine 04276
Dear Mr. Cooper:
The Board of Environmental Protection voted to deny the Oxford Paper Company's application for Sales & Use Tax Exemption for bark boilers at their meeting on June 20, 1973. The Board feels that Maine law prohibiting the dumping of any forest product refuse in waters of the State has been in effect for several years, and that bark from your operation can not be considered water-born [sic] industrial waste. In addition the oil savings realized by cutting back the oil fired boilers when the bark boiler is on line was felt to be substantial.
Very truly yours,
/s/ James R. Gray
James R. Gray, *Assistant Engineer*
Division of Industrial Services
Bureau of Water Quality Control

5. 38 M.R.S.A. § 415 [in pertinent part]:
Except where otherwise specified by statute, any person aggrieved by any order or decision of the commission in regard to any matter upon which there was a hearing before the commission and of which a transcript of said hearing is available, may, within 30 days after notice of the filing of such order or decision, appeal therefrom to the Superior Court by filing a notice of appeal stating the points of appeal. Notice of the appeal shall be ordered by the court without a jury in the manner and with the rights provided by law in other civil actions so heard. The proceedings shall not be de novo. The court shall receive into evidence true copies of the transcript of the hearing, the exhibits thereto and, the decision of the commission. The court's review shall be limited to questions of law and to whether the commission acted regularly and within the scope of its authority and the commission's decision shall be final so long as supported by substantial evidence. The court may affirm, reverse or remand the commission's decision for further proceedings. Appeals from all other orders or decisions of the commission, unless otherwise specified by statute, shall be taken pursuant to Rule 80B of the Maine Rules of Civil Procedure.

6. M.R.Civ.P. 80B [prior to amendments effective April 15, 1975]:
*(a) Mode of Review.* When review by the Superior Court, whether by appeal or otherwise, of any action or failure or refusal to act by a governmental agency, including any department, board, commission, or officer, is provided by statute or is otherwise available by law, proceedings for such review shall, except as otherwise provided by statute, be governed by these Rules of Civil Procedure as modified by this rule. The complaint and summons shall be served upon the agency and all parties in accordance with the provisions of Rule 4. The complaint shall include a concise statement of the grounds upon which the plaintiff contends he is entitled to relief, and shall demand the relief to which he believes himself entitled. No responsive pleading need be filed unless required by statute or by order of the court. Leave to amend pleadings shall be freely given when necessary to permit a proceeding erroneously commenced under this rule to be carried on as an ordinary civil action.
*(b) Time Limits; Stay.* The time within which review may be sought shall be as provided by statute, except that if no time limit is specified by statute, the complaint shall be filed within 30 days after notice of any action or refusal to act of which review is sought unless the court enlarges the time in accordance with Rule 6(b), and, in the event of a failure to act, within six *months after expiration of the time in which* action should reasonably have occurred. Except as otherwise provided by statute, the filing of the complaint does not stay any action of which review is sought, but the court may order a stay upon such terms as it deems proper.
*(c) Trial or Hearing; Judgment.* Any trial of the facts where provided by statute or other-

by the filing of substantially identical complaints in the Kennebec County and Oxford County Superior Courts. Each of the complaints contained the following essential allegations:

(1) [T]he [Board] did not act regularly within the scope of its authority . .;

(2) [T]he [Board]'s decision is not supported by the law and the facts in this case . . .;

(3) [A]s a matter of law, [the Board's decision] is arbitrary and unreasonable;

(4) The only reasons stated for denial of certification in the letter of the Department of Environmental Protection of June 29, 1973 . . . are erroneous or immaterial as a matter of law . . .;

(5) [T]he facts and law in this case show that the . . . boiler was a water pollution control facility within the meaning of 36 M.R.S.A. § 1760 . . .; in the alternative . . . the facts and law in this case show that the . . . boiler was an air pollution control facility within the meaning of 36 M.R.S.A. § 1760 . . . .

Subsequently, and before either of the aforementioned actions had come to trial, Ethyl applied anew to the Board for certification of its boiler as a water and air pollution control facility, on this occasion pursuant to 36 M.R.S.A. §§ 655(1)(N), 656(1)(E) [7] as a prerequisite to obtaining an exemption from property taxes. On September 26,

---

wise shall be without jury unless the Constitution of the State of Maine or a statute gives the right to trial by jury. The judgment of the court shall affirm, reverse, or modify the decision under review as provided by law.

*(d) Review by the Law Court.* Unless by statute or otherwise the decision of the Superior Court is final, review by the Law Court shall be by appeal or report in accordance with these Rules of Civil Procedure, and no other method of appellate review shall be permitted.

**7.** 36 M.R.S.A. §§ 655(1)(N), 656(1)(E):

§ *655. Personal property*
The following personal property is exempt from taxation:

*1. Personal property.*
\* \* \* \* \* \*

N. Water pollution control facilities and air pollution control facilities as defined in section 656, subsection 1, paragraph E.
\* \* \* \* \* \*

§ *656. Real estate.*
The following real estate is exempt from taxation:

*1. Real estate.*
\* \* \* \* \* \*

E. *Pollution control facilities.*
*(1)* Water pollution control facilities having a capacity to handle at least 4,000 gallons of waste per day, certified as such by the Environmental Improvement Commission, and all parts and accessories thereof.
As used in this paragraph:
*(a)* "Facility" means any disposal system or any treatment works, appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial, commercial or domestic waste.
*(b)* "Disposal system" means any system used primarily for disposing of or isolating industrial, commercial or domestic waste and includes thickeners, incinerators, pipelines or conduits, pumping stations, force mains and all other constructions, devices, appurtenances and facilities used for collecting or conducting water borne industrial, commercial or domestic waste to a point of disposal, treatment or isolation, except that which is necessary to the manufacture of products.
*(c)* "Industrial waste" means any liquid, gaseous or solid waste substance capable of polluting the waters of the State and resulting from any process, or the development of any process, of industry or manufacture.
*(d)* "Treatment works" means any plant, pumping station, reservoir or other works used primarily for the purpose of treating, stabilizing, isolating or holding industrial, commercial or domestic waste.
*(e)* "Commercial waste" means any liquid, gaseous or solid waste substance capable of polluting the waters of the State and resulting from any activity which is primarily commercial in nature.
*(f)* "Domestic waste" means any liquid, gaseous or solid waste substance capable of polluting the waters of the State and resulting from any activity which is primarily domestic in nature.
*(2)* Air pollution control facilities, certified as such by the Environmental Improvement Commission, and all parts and accessories thereof.
As used in this paragraph:
*(a)* "Facility" means any appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling, eliminating or disposing of industrial air pollutants.
\* \* \* \* \* \*

1973 the Board refused Ethyl's request, again without holding a hearing, and Ethyl received notice of this decision in a letter from the same Board staff member who had written the previous letter.[8] No record was made of the Board's proceedings. Ethyl again sought judicial review, this time by the filing of a single complaint in the Oxford County Superior Court. This complaint repeated the first three allegations contained in the previous two complaints and added,

> (6) The only reasons stated for denial of certification in the letter of the Department of Environmental Protection dated October 16, 1973 . . . are erroneous or immaterial as a matter of law . . . . The reasons given in the previous denial of sales tax exemption were likewise erroneous or immaterial;
>
> (7) [T]he facts and law in this case show that the . . . boiler was a water pollution control facility . . . within the meaning of 36 M.R.S.A. § 656 . . . ; the facts and law in this case show that the . . . boiler was also an air pollution control facility within the meaning of 36 M.R.S.A. §§ 655 & 656 . . . . .

The three actions were consolidated and tried before the Oxford County Superior Court.[9] That court, after hearing extensive testimony about the boiler from five witnesses, all of whom were called by Ethyl, and admitting into evidence twenty-eight exhibits, all but one of which was introduced by Ethyl, issued its order, containing extensive findings of fact and conclusions of law, reversing the decisions of the Board and directing that the boiler be certified as a water *and* air pollution control facility within the meaning of both 36 M.R.S.A. § 1760(29, 30) and 36 M.R.S.A. §§ 655(1)(N), 656(1)(E). By this appeal we are asked to review the conclusions reached by the Superior Court in the course of that court's review of the Board's action.

38 M.R.S.A. § 415, n. 5 *supra*, provides that, upon an appeal from "any order or decision of the [Board] in regard to any matter upon which there was a hearing before the [Board] and of which a transcript of said hearing is available,"

> The court's review shall be limited to questions of law and to whether the [Board] acted regularly and within the scope of its authority and the [Board's] decision shall be final so long as supported by substantial evidence.

The statute further directs that:

> The proceedings shall not be de novo. The court's review is based entirely upon "true copies of the transcript of the hearing, the exhibits thereto and, the decision of the [Board]." *Id.*

In the present case, however, there were no hearings before the Board. Section 415 provides that, as to "any order or decision of the [Board] in regard to any matter upon which there was [not] a hearing before the [Board]",

> Appeals from all other orders or decisions of the commission, unless otherwise specified by statute, shall be taken pursuant to Rule 80B of the Maine Rules of Civil Procedure.

---

8. That letter was likewise written on Department of Environmental Protection stationery and reads as follows:

October 16, 1973
Mr. Stuart Cooper
Pollution Abatement Director
Oxford Paper Co.
Rumford, Maine
Dear Mr. Cooper:
The Board of Environmental Protection voted to deny Oxford's application for Property Tax Exemption on the new Bark-oil boiler at their meeting September 26, 1973.
The application for property tax exemption for this facility was denied on the same grounds as your previous application for Sales and Use Tax Exemption.
Very truly yours,
/s/ James R. Gray
James R. Gray
Assistant Engineer
Division of Industrial Services
Bureau of Water Quality Control

9. *Prior* to trial, but *after* Ethyl had appealed the Board's actions to the Superior Court, the Board issued a document captioned "Findings and Order," enumerating factual and legal reasons why Ethyl's applications were denied.

██The general principles of judicial review are applicable in this case since, as we have seen, there exist no "legislative directions" as to the scope of judicial review of a Board decision made without a hearing. Bearing in mind the seven basic allegations made by Ethyl in its three complaints, we find it necessary to reach only the following issues from among those considered by the Superior Court.

 (I) were the Board's decisions *beyond its statutory power*?;

 (II) did the Board act *without according procedural due process*?;

 (III) were the Board's decisions *based upon a correct interpretation of the pertinent statutes*?[10]

Preliminary to a discussion of these three questions of law, as arrayed, resort may be made to pertinent factual disclosures made to the Superior Court at the *de novo* hearing with respect to the facilities for which exemption is sought. Our careful reading of the Superior Court record leads us to conclude that the Board's decisions to not certify the bark-oil boiler as a water pollution control facility or an air pollution control facility could have rested upon the following facts:

The paper manufacturing process generates large quantities of waste bark. Ethyl's Oxford Paper Company factory generates 1200 cubic yards, or 240 tons of bark per day, or approximately 87,000 tons annually. This bark must be disposed of in some fashion. Prior to the installation of the new bark-oil boiler in late 1972, Ethyl disposed of half its bark by burning it in a "refuse boiler" which in turn produced steam for use in the manufacturing process. The remainder of the bark was loaded onto trucks and hauled to various sites in the Rumford-Mexico area, where it was dumped and utilized as landfill. These sites are not located on land owned by Ethyl, but Ethyl carried out the dumping without charge at the request of the actual landowners. There are between fifty and one hundred such sites in the Rumford-Mexico area.

As the bark at the landfill sites decomposes, decaying organic material is discharged, or "leached" into nearby streams. As a result, the acid level of the streams increases, their oxygen content decreases, and fungi and slime accumulate in the water.[11] In addition, the decomposing bark gives off acetic acid gases which are the cause of offensive odors in the vicinity of the landfill sites. In Ethyl's estimation, it will be at least twenty years before the bark at the landfill sites completely decomposes.

In response to the extensive water and air contamination caused by the bark piles, Mexico adopted an ordinance in 1966 which, by cancelling existing permits for bark dumping and ordering that no such permits be issued in the future, effectively prohibited the dumping of bark in that town. In 1969, Rumford adopted an ordinance which imposed substantial restrictions on bark dumping there.

As a consequence of the enactment of these ordinances, Ethyl became concerned that it would soon have no more landfill sites available on which to dispose of its bark. As Stuart R. Cooper, director of pol-

---

**10.** We do not interpret Ethyl's complaints as alleging that the Board's decisions were *beyond the power which it could constitutionally exercise* or *made without according substantive due process.*

**11.** Ethyl introduced a report prepared by Dennis Purington, an engineer employed by the Department of Environmental Protection, which described the pollution of Swain Brook, near one of the larger bark piles. The report indicated that the hydrogen-ion concentration, or "pH" of the Swain Brook upstream from the bark pile was 6.8, while the pH of the brook downstream from the pile was 5.7. A pH of less than 7.0 indicates acidity. Swain Brook is

classified as a class "C" water as defined in 38 M.R.S.A. § 363, which provides that "There shall be no discharge to these waters which will cause the hydrogen-ion concentration, or 'pH' of these waters to fall outside of the 6.0 to 8.5 range."

 The report also indicated that the biochemical oxygen demand, or "BOD" of Swain Brook upstream from the bark pile was .8, as compared with 63 downstream from the pile. According to Oxford Paper Company's director of pollution abatement, a BOD of 63 "indicate[s] gross pollution."

lution abatement at Oxford Paper Company, testified,

> We were very alarmed, because the mill generates 1200 cubic yards of bark per day which it needs to dispose of somewhere, and with a total prohibition in Mexico and a very restricted system in Rumford, we were quite concerned that the disposal of bark would be stopped completely, and we can't operate unless we have a place to dispose of bark.

Ethyl was thus faced with two alternatives. It could either seek new landfill sites outside the Rumford-Mexico area and truck its bark to those sites, or it could abandon bark dumping altogether for a different method of bark disposal. Because Ethyl considered that it would be "uneconomical" to truck bark outside of the Rumford-Mexico area, it decided on the second alternative.

Ethyl conceived of the bark-oil boiler as the best solution to its bark disposal problem. The boiler, which was built and installed at a cost of $2,400,000 to Ethyl, is designed to generate steam by burning either bark or oil. It has a capacity to burn, and is presently burning, 240 tons of bark per day, or all the bark generated by Ethyl.

The bark-oil boiler supplies approximately 15% of the steam needed at the factory. Ethyl's fuel oil use is reduced to the extent that bark rather than oil is used to generate steam. Since the new boiler began operating, Ethyl's consumption of fuel oil has been significantly reduced, and Ethyl can anticipate a long-term savings due to the use of bark instead of oil to produce steam. The installation of the new boiler will eventually enable Ethyl to retire the refuse boiler formerly used to incinerate bark, which boiler is described by Ethyl as "worn-out" and "inefficient."

When steam is produced in the boiler by burning oil, substantial amounts of sulfur dioxide ($SO_2$) are released into the atmosphere. When the boiler is burning bark, it emits no $SO_2$. It does, however, emit unspecified "particulates" into the air in the amount of .6 tons per day. Such particulates are not released when oil is burned in the boiler.

The boiler is equipped with a "fly ash collector" and a "secondary shave-off system," both of which function to reduce the amount of particulate matter released into the atmosphere by the boiler.

Ethyl is in the process of building an effluent treatment plant to treat liquid effluent from the Oxford Paper Company operation. That facility will generate a certain amount of sludge—a combination of fiber, clay and water. Although under existing technology the burning of sludge is impossible, Ethyl "hopes," as a "long-term objective," to eventually utilize the boiler to burn sludge.

We now treat the Superior Court's conclusions as regards each of these questions in turn.

I. *Were the Board's Decisions Beyond its Statutory Power?*

◼ The presiding Justice reached several "conclusions of law" which suggest that the court was in agreement with Ethyl's allegation that the Board "did not act regularly within the scope of its authority." We need not reproduce the court's statements which give rise to this suggestion; suffice it to say that the court was apparently of the opinion that the Board transgressed its statutory authority by (1) not conducting any hearings on Ethyl's applications, and (2) not compiling a record of its proceedings. It is perfectly clear to us, however, that the Board was statutorily obligated neither to hold any hearings nor to make a record of its proceedings.

The statute which created the Board, 38 M.R.S.A. § 361, nowhere mandates that the Board must in every case hold a hearing before rendering a decision. Nor do we find a hearing requirement in either 36 M.R.S.A. § 1760(29, 30) or 36 M.R.S.A. §§ 655(1)(N), 656(1)(E), the substantive statutes which are involved in this case. Moreover, as we indicated in our discussion of 38 M.R.S.A. § 415, that provision rather plainly contemplates that not all orders or decisions of the Board from which appeals

are taken will have been preceded by a hearing.

Since no hearings were held, the Board's proceedings were not recorded and transcribed, and whatever evidentiary material the Board may have had before it was not compiled and preserved for possible judicial review. See 38 M.R.S.A. § 361, which would seem to require that the Board make a record in cases *in which it conducts a hearing.* At the time that Ethyl's applications were before the Board, however, there was no statutory requirement that the Board compile a record in a case in which it did *not* hold a hearing.[12]

We conclude that there is no basis for Ethyl's allegation that the Board "did not act regularly within the scope of its authority" in denying Ethyl's applications. The Board's actions were entirely within its statutory authority. To the extent that the presiding Justice held to the contrary, he was in error.

## II. *Did the Board Act Without According Procedural Due Process?*

The presiding Justice concluded, as a matter of law, that

> It was a denial of due process for the Board of Environmental Protection to reach its decision [sic [13]] on evidence not in the record which [Ethyl] had no opportunity to examine or analyze, explain or rebut.

As we have pointed out, the Board was not required *by statute* to hold any hearings or to make a record. This last-quoted statement from the court's order indicates that the presiding Justice may nevertheless have reasoned that the Board's procedure was *constitutionally* defective under the Maine or the federal due process clauses, Constitution of the State of Maine, Art. I, § 6–A, and Constitution of the United States, Amend. XIV, § 1, respectively.

■ Due process is a flexible concept which entails no particular form of procedure. *In re Maine Clean Fuels, Inc.*, Me., 310 A.2d 736, 746 (1973); *State v. Johnson*, Me., 265 A.2d 711, 714 (1970).

The court's finding that "It was a denial of due process for the Board of Environmental Protection to reach its decision on evidence not in the record . . ." may be readily put to rest. If, as we have shown, the Board was not required by law to make a record of its proceedings, and if accordingly none was made, the Board cannot be reproached—on constitutional or other grounds—for going "outside" the record in making its decisions. Since there *was* no record, there is simply no basis for the court's assertion that the Board reached its decisions on evidence "not in the record." The court's conclusion that Ethyl's due process rights were violated by the absence of a record rests on the misconception that a record was otherwise legally mandated. We thus have no need to consider whether a record was *independently* required by the dictates of due process.

■ The court's statement that the Board's decisions were based on "evidence . . . which [Ethyl] had no opportunity to examine or analyze, explain or rebut,"

---

**12.** Shortly after the administrative proceedings involved in this case, the Legislature enacted 1 M.R.S.A. § 404–A (effective October 3, 1973). Subsection (2) of that statute, which is applicable to all state agencies, directs that "Whenever an agency denies approval of an application submitted to it, or denies a license, certificate or any other type of permit, or issues its approval or grants such license, certificate or any other type of permit upon conditions not otherwise specifically required by the statute, ordinance or regulation pursuant to which the approval or granting is issued, the agency shall set forth the reason or reasons for its decision and make findings of fact, in writing, sufficient to apprise the applicant and any interested member of the public of the basis for such decision."

This provision became law at too late a date to have any bearing on the Board's manner of proceeding in the instant case.

**13.** As we have seen, the Board in fact rendered *two* decisions: it denied Ethyl's application for certification of its boiler as a water or air pollution control facility for the purpose of an exemption from sales and use taxes, and it denied Ethyl's application for certification of its boiler as a water or air pollution control facility for the purpose of an exemption from property taxes.

implies that the Justice was of the opinion that Ethyl was constitutionally entitled to a hearing before the Board. We disagree.

Where, as in this case, there is no opportunity for a hearing before the administrative agency itself, due process is nevertheless satisfied by the availability of a hearing—in the form of a trial—in the course of judicial review. *Bourjois, Inc. v. Chapman*, 301 U.S. 183, 189, 57 S.Ct. 691, 695, 81 L.Ed. 1027 (1937); *see* 1 K. Davis, Administrative Law Treatise § 7.10 (1958); 16A C.J.S. Constitutional Law § 628b(1) (1956), and cases cited therein. The fact that Ethyl was able, by reason of 38 M.R. S.A. § 415, to obtain judicial review of the Board's denials of its applications vitiates any suggestion that, because there were no hearings before the Board, Ethyl was deprived of its procedural rights under the Maine and United States constitutions.

We hold that the court erred in its determination that Ethyl's due process rights were violated by the Board's procedure in this case.

III. *Were the Board's Decisions Based Upon a Correct Interpretation of the Pertinent Statutes?*

The Board did not issue its "Findings and Order" until February 27, 1974, well after Ethyl had filed its appeals of the Board's decisions in the Superior Court. Although the court received the "Findings and Order" into evidence "de bene," it disregarded them in reaching its judgment for the reason that they "represent Board action subsequent to the filing of the appeals . . . and cannot be used to vary or enlarge the statements of Board action prior to the appeals."

In declining to give probative value to the Board's "Findings and Order," the Justice correctly applied this Court's reasoning in *Gagne v. Inhabitants of City of Lewiston*, Me., 281 A.2d 579, 583 (1971), where we said that

[T]he filing of an appeal removes the cause from the administrative tribunal to the Superior Court. We hold that the appeal terminates the authority of the tribunal to modify its decisions unless the court remands the matter to the tribunal for its further action, thereby reviving its authority.

Having properly decided to discount the Board's "Findings and Order," the Justice below could not look to that document in order to ascertain how the Board interpreted the substantive law involved in this case. He likewise apparently did not rely on the two letters, n. 4 and n. 8 *supra* in which Ethyl received word that its applications had been denied by the Board, to illuminate the Board's legal reasoning. Those letters were written by a Board staff member, and the Justice may have quite reasonably judged that the opinions expressed in them as to why Ethyl's applications had been denied were merely an expression of the letter writer's personal views. Finally, we note that the brief excerpts of the minutes of the Board's meetings at which Ethyl's applications were denied,[14] which were introduced into evidence, shed but a dim light on the Board's legal reasoning. The court does not appear to have attached any significance to them.

The Superior Court was thus, for all practical purposes, unapprised of the legal reasoning on which the Board's denials of Ethyl's applications was predicated. We, of course, are in this respect in the same position as was the court below. We do know, nonetheless, that the Board reached the *ultimate conclusions of law* that Ethyl's bark-oil boiler is not a water pollution control

---

14. The excerpt from the minutes of the Board's meeting of June 20, 1973 reads,

The application of Oxford Paper Company for tax exemptions under the State's sales and use tax exemption laws for a new bark boiler was denied on the basis that the facilities are not primarily pollution abatement facilities.

The excerpt from the minutes of the Board's meeting of September 26, 1973 reads,

The application of Oxford Paper Company for a property tax exemption on a bark oil burner was denied on the basis that this equipment is not primarily for pollution abatement purposes.

facility or an air pollution control facility, as defined by the applicable statutes. With those conclusions we agree.

Upon close examination of those statutes, it is apparent that the Legislature in its wisdom has defined three distinct types of "pollution control facilities." The definition of a water pollution control facility found in 36 M.R.S.A. § 1760(29) is in some respects different from the definition of a water pollution control facility found in 36 M.R.S.A. § 656(1)(E)(1). The definitions of an air pollution control facility which are given in 36 M.R.S.A. § 1760(30) and 36 M.R.S.A. § 656(1)(E)(2) are, by contrast, identical. We now set out these statutory definitions in full.

A facility is a *water pollution control facility qualifying for an exemption from sales and use taxes* if

it is "installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial waste," § 1760(29)(B),

AND IT IS EITHER

(A) a " 'disposal system' " (*i. e.*, a "system used primarily for disposing of or isolating industrial waste", including "thickeners, incinerators, pipelines or conduits, pumping stations, force mains and all other constructions, devices, appurtenances and facilities used for collecting or conducting water borne industrial waste to a point of disposal, treatment or isolation"), § 1760(29)(A),

which

is not "necessary to the manufacture of products", § 1760(29(A);

OR

(B) a " 'treatment works' " (*i.e.*, a "plant, pumping station, reservoir or other works used primarily for the purpose of treating, stabilizing, isolating or holding industrial waste"), § 1760(29)(D);

OR

(C) an "appliance, equipment, machinery, installation or structures", § 1760(29)(B).

A facility is a *water pollution control facility qualifying for an exemption from property taxes* if

it has "a capacity to handle at least 4,000 gallons of waste per day," § 656(1)(E)(1)

AND

it is "installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial, commercial or domestic waste", § 656(1)(E)(1)(a),

AND IT IS EITHER

(A) a " 'disposal system' " (*i. e.*, a "system used primarily for disposing of or isolating industrial, commercial or domestic waste", including "thickeners, incinerators, pipelines or conduits, pumping stations, force mains and all other constructions, devices, appurtenances and facilities used for collecting or conducting water borne industrial, commercial or domestic waste to a point of disposal, treatment or isolation,"), § 656(1)(E)(1)(b),

which

is not "necessary to the manufacture of products", § 656(1)(E)(1)(b);

OR

(C) an "appliance, equipment, machinery, installation or structures", § 656(1)(E)(1)(a).

A facility is an *air pollution control facility qualifying for an exemption from both sales and use taxes and property taxes* if

it is an "appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling, eliminating or disposing of industrial air pollutants." §§ 1760(30)(A), 656(1)(E)(2) (a).

Insofar as the Board denied Ethyl's applications, it necessarily determined, as a matter of law, *first,* that Ethyl's bark-oil boiler is not a water pollution control facility as defined by § 1760(29), and *second,* that it is not a water pollution control facility as defined by § 656(1)(E)(1), and *third,* that it is not an air pollution control facility as defined in § 1760(30) and § 656(1)(E)(2).

The Superior Court concluded, as a matter of law, that the bark-oil boiler is a water pollution control facility as defined in

§ 1760(29), a water pollution control facility as defined in § 656(1)(E)(1), and an air pollution control facility as defined in § 1760(30) and § 656(1)(E)(2). As we have previously indicated, however, the court below arrived at these conclusions by its own interpretation of the statutory definitions as applied to the factual findings. In so doing, the court misconstrued the statutes. The Superior Court's "conclusions of law" are therefore erroneous in that they are based upon an incorrect interpretation of the statutes. In these peculiar circumstances, it falls to us to address the issue whether the Board was correct in concluding, as a matter of law, that Ethyl's bark-oil boiler is neither a water pollution control facility as defined in § 1760(29), nor a water pollution control facility as defined in § 656(1)(E)(1), nor an air pollution control facility as defined in § 1760(30) and § 656(1)(E)(2). We separate this issue into its three component questions and organize our discussion in the following manner:

IV(a). Was the Board correct in concluding, as a matter of law, that Ethyl's bark-oil boiler is not a water pollution control facility as defined in 36 M.R.S.A. § 1760(29)?

IV(b). Was the Board correct in concluding, as a matter of law, that Ethyl's bark-oil boiler is not a water pollution control facility as defined in 36 M.R.S.A. § 656(1)(E)(1)?

IV(c). Was the Board correct in concluding, as a matter of law, that Ethyl's bark-oil boiler is not an air pollution control facility as defined in 36 M.R.S.A. §§ 1760(30), 656(1)(E)(2)?

\*     \*     \*     \*     \*     \*

IV(a). *Was the Board correct in concluding, as a matter of law, that Ethyl's bark-oil boiler is not a water pollution control facility as defined in 36 M.R.S.A. § 1760(29)?*

In order to qualify as a water pollution control facility under § 1760(29), *any* facility, regardless of whether it is a "disposal system," § 1760(29)(A), or a "treatment works," § 1760(29)(D), or an "appliance, equipment, machinery, installation or structures", § 1760(29)(B), must meet the basic requirement set out in § 1760(29)(B), *i. e.*, it must have been "installed, acquired or placed in operation *primarily for the purpose* of reducing, controlling or eliminating water pollution caused by industrial waste". (Emphasis added.) If it is evident that the facility for which certification is sought fails to satisfy this criterion, the inquiry may be conveniently foreshortened, since the facility then is precluded from coming within the definition of a water pollution control facility found in § 1760(29), even though it might be within the definition of a "disposal system" or a "treatment works."

Section 1760(29)(B) requires that we isolate the *purpose*[s] for which a facility was "installed, acquired or placed in operation" and then decide which one of these is *primary*. Since we find no indication that the Legislature intended that the word "primarily" be given a peculiar or technical meaning, we construe it "according to the common meaning of the language." 1 M.R.S.A. § 72(3). In Webster's Third New International Dictionary 1800 (1971), we find the following definitions:

> *primarily* . . .1 : first of all: FUNDA-MENTALLY, PRINCI-PALLY . . ..
> *primary* . . .1 : something that stands first in order, rank or importance . . ..

If a facility is "installed, acquired or placed in operation" for only *one* purpose, that purpose is, of course, *primary*. If, as will often be the case, a facility is "installed, acquired or placed in operation" for *multiple* purposes, only one of these can, by definition, be characterized as *primary*.

It is not clear from the language of § 1760(29)(B) itself just how the *primary* purpose for which a facility was "installed, acquired or placed in operation" is to be determined. Specifically, the provision does not indicate whether we should look to the taxpayer's reasons for installing a facility *or* to the actual functions of the facility. Is the statutory *primary purpose* test a subjective standard, focusing on why a facility

was installed, or an objective standard, focusing on what the facility does?

Fortunately, this question of statutory interpretation was largely resolved in our first decision involving these same tax exemption statutes, *Statler Industries, Inc. v. Board of Environmental Protection*, Me., 333 A.2d 703 (1975). In that case, we interpreted the phrase "primarily for the purpose" as used in §§ 1760(29)(B), (30)(A), §§ 656(1)(E)(1)(a), (1)(E)(2)(a) as follows:

Construed in accordance with common meaning, this phrase connotes a basic, fundamental or principal purpose as opposed to one which is secondary or merely incidental. Thus, we construe the statutory language as allowing a tax exemption to those pollution abatement facilities which are basic or fundamental to the control, reduction or elimination of either water or air pollution caused by industrial waste.

*Id.* at 706 (footnote omitted).

██ In *Statler Industries* we strongly implied that the primary purpose for which a facility is "installed, acquired or placed in operation" is to be determined by reference to what the facility actually does:

"It is self-evident that tax exemption was not to be extended to pollution control facilities generally but only to those utilized *primarily for the purpose* of pollution abatement.

*Id.* (Emphasis in original.) We reaffirm this interpretation here.

██ We think it plain that by incorporating the *primary purpose* standard into § 1760(29)(B), the Legislature intended to limit the tax exemption to those facilities which are *utilized* "primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial waste". If § 1760(29)(B) were to be construed to authorize an exemption merely because, in installing a facility, the taxpayer was primarily motivated by an intention to reduce, control or eliminate "water pollution caused by industrial waste," this would mean that

a facility might qualify for the exemption, regardless of whether it performed as intended. We cannot believe that the legislation was designed to make the intention of the taxpayer, as distinguished from the use of the facility, the touchstone of the exemption. Mindful that, "In construing a statute, the Court should avoid an interpretation which would lead to an absurd result even though it must disregard the strict letter of the statute", *Cornwall Industries, Inc. v. Maine Department of Manpower Affairs, Employment Security Division*, Me., 351 A.2d 546, 553 (1976), we construe § 1760(29)(B) as requiring that, in order to be certified as a water pollution control facility, a facility must be *utilized* "primarily for the purpose of reducing, controlling or eliminating water pollution created by industrial waste". *Statler Industries, supra* at 706.

We may now turn directly to the issue of whether Ethyl's bark-oil boiler is utilized "primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial waste". It is patently clear that the boiler serves two basic purposes, or functions, in the paper manufacturing operation at Oxford Paper Company: it disposes of waste bark and it produces steam.[15] Of these two functions, it is fair to characterize bark disposal as *primary*. This follows logically since Ethyl has ways of generating steam available to it other than by burning bark, it lacks an economically feasible alternative means of bark disposal, in view of the Rumford and Mexico ordinances restricting the dumping of bark. The *primary purpose* for which the bark-oil boiler is utilized is to dispose of waste bark.

The issue is now reduced to whether the primary function of the bark-oil boiler, *i. e.*, the disposal of waste bark, is within the meaning of the statutory phrase "reducing, controlling or eliminating water pollution caused by industrial waste." We answer this question in the negative.

---

15. Although the boiler *may* be used to burn sludge at some time in the future, it is not currently utilized for this purpose.

Although there is no doubt that Ethyl's bark is "industrial waste," since it is a "solid waste substance capable of polluting the waters of the State and resulting from [a] process . . . of industry or manufacture", § 1760(29)(C), no extensive discussion is necessary to establish that bark in and of itself does not constitute "water pollution *caused by* industrial waste," § 1760(29)(B) (emphasis added).

The term "water pollution" has been defined by one authority as "any man-made alteration of the quality of the water that appreciably impairs its usefulness for a particular purpose." 3 Waters and Water Rights 5 (B. Gindler ed. 1967). Bark itself is merely a "substance *capable* of polluting the waters of the State", § 1760(29)(C) (emphasis added). Whether bark in fact causes water pollution is entirely dependent on what is done with it *after* it has been separated from the logs. Used as a landfill, for example, bark is a demonstrable source of water pollution.

Section 1760(29)(B), as we have interpreted it, specifically requires that a facility be utilized "primarily for the purpose of reducing, controlling or eliminating *water pollution caused by industrial waste*" (emphasis added), as distinguished from "industrial waste" itself. The goal at which the statute is directed is not the abatement of "industrial waste," but the abatement of "water pollution."

As we have pointed out, the bark-oil boiler is utilized primarily to dispose of, or "eliminate" Ethyl's bark—"industrial waste." The boiler in no way abates the extensive water pollution which has been created by the piles of bark that Ethyl has dumped throughout the Rumford-Mexico area over the years. That pollution will persist, in Ethyl's estimation, for a period of at least twenty years. We have no quarrel with Ethyl's argument that because the installation of the bark-oil boiler has enabled Ethyl to discontinue bark dumping, any

water pollution that might have been caused by bark deposited at landfill sites in the future will not occur. It is undeniable that Ethyl's utilization of the new boiler to dispose of its bark "reduces" water pollution in the sense that incinerating bark causes no water pollution by comparison with the water pollution which was and is being caused by the bark piles. This consequence, however, is entirely incidental to the boiler's *primary* function of bark disposal.

We conclude that Ethyl's bark-oil boiler is not utilized as a matter of law "primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial waste," and is therefore not within the definition of a "facility" in § 1760(29)(B). On the basis of the failure of the boiler to satisfy this criterion alone, the Board could have concluded that the bark-oil boiler is not entitled to certification as a water pollution control facility within the intent of § 1760(29).

IV(b). *Was the Board Correct in Concluding, as a Matter of Law, that Ethyl's Bark-oil Boiler Is Not a Water Pollution Control Facility as Defined in 36 M.R.S.A. § 656(1)(E)(1)?*

The definition of a water pollution control facility in § 656(1)(E)(1) requires that *any* facility, regardless of whether it is a "disposal system," § 656(1)(E)(1)(b), or a "treatment works," § 656(1)(E)(1)(d), or an "appliance, equipment, machinery, installation or structures", § 656(1)(E)(1)(a), must meet the test of § 656(1)(E)(1)(a): it must have been "installed, acquired or placed in operation *primarily for the purpose* of reducing, controlling or eliminating water pollution caused by industrial, commercial or domestic waste.[16] (Emphasis added.) For the reasons discussed in the preceding section, Ethyl's bark-oil boiler fails to satisfy this standard, and the Board properly declined to certify the bark-oil boiler as a

---

**16.** The only difference between § 1760(29)(B) prior to its amendment on October 3, 1973 and § 656(1)(E)(1)(a) is the inclusion of the words "commercial or domestic waste" in § 656(1)(E)

(1)(a). As has been noted, Ethyl's waste bark constitutes "industrial waste," as defined in both § 1760(29)(C) and § 656(1)(E)(1)(c).

water pollution control facility under § 656(1)(E)(1) on this ground alone.

IV(c). *Was the Board Correct in Concluding, as a Matter of Law, that Ethyl's Bark-oil Boiler Is Not an Air Pollution Control Facility as Defined in 36 M.R.S.A. §§ 1760(30), 656(1)(E)(2)?*

Section 1760(30)(A) and § 656(1)(E)(2)(a) both define an air pollution control facility as an "appliance, equipment, machinery, installation or structures installed, acquired or placed in operation *primarily for the purpose* of reducing, controlling, eliminating or disposing of industrial air pollutants." (Emphasis added.) A facility need only meet this single standard in order to be certified as an air pollution control facility under these statutes.

■■■ We construe §§ 1760(30)(A), 656(1)(E)(2)(a), similarly to the way we have interpreted §§ 1760(29)(B), (1)(E) (1)(a), to require that a facility must be *utilized* "primarily for the purpose of reducing, controlling, eliminating or disposing of industrial air pollutants" to qualify for certification as an air pollution control facility.

As we have found, Ethyl's bark-oil boiler is utilized primarily for the purpose of disposing of waste bark. Waste bark disposal does not fall *within the purview of the statutory language,* "reducing, controlling, eliminating or disposing of industrial air pollutants." Just as bark itself does not constitute "water pollution," bark is not an "air pollutant."

A "pollutant" is "something that pollutes." Webster's Third New International Dictionary 1765 (1975). An "air pollutant" is thus something that pollutes the air.[17] Bark itself does not pollute the air. It is merely, under certain circumstances, a *source* of air pollutants.

The primary function of Ethyl's bark-oil boiler—the disposal of waste bark—is not the equivalent of the reduction, control, elimination or disposal of "industrial air pollutants." Although Ethyl's utilization of the new boiler to generate steam by burning bark rather than oil may result in a reduction of sulfur dioxide emissions—"air pollutants"—from the Oxford Paper Company factory,[18] this result is insufficient to establish that the boiler is utilized primarily for the reduction of "industrial air pollutants." That effect is incidental to the boiler's primary function of disposing of waste bark. Moreover, there is no dispute that the boiler is equipped with a "fly ash collector" and a "secondary shave-off system" which function to reduce particulate emissions from the boiler and suggest that the primary purpose for which the boiler itself is utilized is something other than the abatement of air pollution.

We hold that the Board was correct as a matter of law in rejecting Ethyl's claim that its bark-oil boiler ought to be certified as an air pollution control facility under §§ 1760(30), 656(1)(E)(2).

■■■ The Superior Court's conclusions that the bark-oil boiler is a water pollution control facility as defined in § 1760(29), a water pollution control facility as defined in § 656(1)(E)(1), and an air pollution control facility as defined in §§ 1760(30), 656(1)(E)(2), are incorrect. Indeed, there is a patent inconsistency in Ethyl's claim, and in the Superior Court's adoption thereof, that the boiler is *both* a water pollution control facility *and* an air pollution control facility. Since a water pollution control facility is a facility utilized "primarily for the purpose of reducing, controlling or eliminating *water pollution* caused by industrial

17. "Air pollution" is defined in 38 M.R.S.A. § 582(3) as "the presence in the outdoor atmosphere of one or more air contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant or animal life or to property, or which unreasonably interfere with the enjoyment of life and property throughout the State or throughout such areas of the State as shall be affected thereby . . . ."

18. It is worth repeating, in this regard, that although no $SO_2$ is released into the atmosphere by the burning of bark, substantial amounts of "particulates" are emitted.

waste," § 1760(29)(B) (emphasis added), or a facility utilized "primarily for the purpose of reducing, controlling or eliminating *water pollution* caused by industrial, commercial or domestic waste", § 656(1)(E)(1)(a) (emphasis added), and since an air pollution control facility is a facility utilized "primarily for the purpose of reducing, controlling, eliminating or disposing of industrial *air pollutants*", §§ 1760(30)(A), 656(1)(E)(2)(a) (emphasis added), and since, as we have observed, a facility may be said to be utilized for but one *primary* purpose, any given facility may qualify as a water pollution control facility *or* an air pollution control facility, but *not both.*

The decisions of the Board of Environmental Protection were correct and proper as a matter of law. Since we sustain the appeal of the Board of Environmental Protection, we find no occasion to discuss certain procedural issues raised by the appellant.

The entry must be:

Appeal sustained.

WEATHERBEE, J., sat at oral argument but died before the adoption of this opinion.

DUFRESNE, C. J. and ARCHIBALD, J., concurring.

POMEROY, J., dissenting and WERNICK, J., joining in dissent.

POMEROY, Justice, dissenting (WERNICK, J., joining in the dissent).

I respectfully dissent both as to the conclusion reached by the majority and the reasoning by which such conclusion was reached.

The majority opinion concludes that Ethyl Corporation is not entitled to a certificate from the Board of Environmental Protection, which certificate is prerequisite to a tax exemption under the provisions of 36 M.R.S.A. § 656(1)(E)(i) and 36 M.R.S.A. § 1760(29).

There is statutory direction given the Board of Environmental Protection to issue the requisite certificate to an applicant who demonstrates that it has purchased and installed a water pollution control facility, i. e.,

"appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial waste".

The majority opinion reasons that the Board acted correctly when it denied the tax exemption certificate to Ethyl Corporation. It concedes the Board held no hearing, nor did it record any reason for the denial of the exemption certificate. It merely made the conclusionary decision that the tax exemption certificate was denied. The majority opinion approves this action.

As earlier indicated, I do not agree that the ultimate conclusion of the Board of Environmental Protection is justified.

The majority's conception of the manner and scope of judicial review *of the kind of administrative determination here made by an agency charged with responsibility to understand and evaluate complex and scientific information* is not acceptable to me.

In *Maine Motor Rate Bureau*, Me., 357 A.2d 518 (1976), despite the existence of a hearing and formal findings by the administrative agency, we found ourselves in a predicament similar to that of the present situation. We there stated categorically that were the court to supply a rationale by which an ultimate administrative determination may be supported, the court would improperly encroach upon the administrative domain. We therefore remanded the case to the Public Utilities Commission[1] with specific instructions that it clarify and amplify the findings and reasoning found by our judicial review to be insufficient in terms of *legal* requirements.

In so acting, we relied on principles which have been developed in recent decades by

---

1. In the *Maine Motor Rate Bureau* case the statutory appeal procedure utilized did not involve the intermediate review of the Superior Court. *See*: 35 M.R.S.A. § 303.

the Supreme Court of the United States concerning the appropriate manner and scope of judicial review of action of federal administrative agencies. *See: Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942); *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Topeka & Santa Fe R. Co. V. Wichita Board of Trade*, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).

Following the reasoning of the highest Court of the land, we embraced as a sound principle to govern the judicial review of administrative action that the administrative body must adequately set forth, initially, the subsidiary grounds underlying its ultimate decision,

" '[f]or we must know what a decision means before the duty becomes ours to say whether it is right or wrong.' " (p. 526 of 357 A.2d, citing *Topeka & Santa Fe R. Co., supra* )

This sensible rule has received the overwhelming support of other federal and state courts. *See* : applicable authorities as collected in 2 Davis, Administrative Law Treatise § 16.01, p. 435 (1958).[2]

The majority's approach, here, also trenches upon more generalized administrative law principles announced in other recent cases of this court.

In *State ex rel. Brennan v. R. D. Realty Corp.*, Me., 349 A.2d 201 (1975), we disapproved total bypass of administrative proceedings in regard to the very agency now before the court, reasoning:

"One of the obvious results of the creation of the Maine Board of Environmental Protection is that an agency has been created which has developed an expertise in resolving the special problems with which it is, by law, required to become concerned. Merest prudence suggests that the courts ought to have the benefit of the  .  .  . [Board's] prior expert evaluation  .  .  . before it intervenes in a controversy over which the  .  .  . [Board] has jurisdiction". (p. 207 of 349 A.2d)

*See also: Gagne v. Lewiston Crushed Stone Company, Inc.*, Me., 367 A.2d 613 (1976).

The reviewing court lacks the *"benefit of the  .  .  . [Board's] prior expert evaluation"*, however, when it has received only the Board's naked ultimate determination. Further, when the court supplies what *it* conceives to be the line of reasoning the administrative body *could* properly utilize, were that agency to have exercised its expertise, the court would invade the administrative province and defeat its own announced judicial policy of deference to administrative expertise.[3]

Professor Davis treats those cases without a hearing as different from the others, and notes that in practice courts sometimes require less of informal agencies. Davis, *supra*, § 16.00, p. 559 (1970 Supp.). He nevertheless argues that the purposes furthered by requiring administrative articulation of its acts are even more important where no hearing took place.

I agree.

Cited as goals to be achieved by administrative clarification of reasoning processes

---

**2.** Even one authority who questions the utility of remand to the administrative agency, because of likelihood that the agency will merely re-rationalize the same result, concludes that the rule may well serve its purpose by improving future administrative practice. Jaffe, Judicial Control of Administrative Action at 589, 717 (1965).

**3.** The majority erroneously analogizes, at note 13, the judicial substitution of its rationale for that of the agency to an appellate court's substitution of correct legal reasoning to support the result of a lower court. It was long ago recognized that the two situations are very different—the reviewing court may not supply

a different rationale for an administrative conclusion, for to do so the court would not be acting in the area in which it is expert—determining *law*—but would be encroaching upon the expertise which is the province of the administrative function. For various reasons, the administrative agency may not want to use the rationale which the court may conceive that it *could* have used. *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1942). *See also: Maine Motor Rate Bureau*, Me., 357 A.2d 518, 527 (1976).

are the following: (1) most prominently, the facilitation of intelligent judicial review; (2) prevention of judicial usurpation of administrative functions; (3) inducing more careful agency consideration of the issues before it; (4) informing parties so that they may better evaluate the need for, and basis of, further action; and (5) curbing administrative tendencies to act beyond statutorily conferred authority. 2 Davis, *supra* § 16.05, p. 444. Additionally, the articulation of rationales in past cases will provide the agency, and those appearing before it, with precedents to guide future action and promote consistency.

It is plain that these purposes are served whether or not agency action follows a hearing. In fact, administrative clarification of its rationale will be more beneficial where the reviewing court has not even a hearing transcript before it. Davis, *supra* § 16.00, p. 561 (1970 Supp.). *See also: Beck v. Securities & Exchange Commission*, 413 F.2d 832 (6th Cir. 1969); *Hanly v. Securities & Exchange Commission*, 415 F.2d 589, 598–99 (2nd Cir. 1969).[4]

Aside from my disagreement with the methodology of the judicial review taken by the majority, I likewise disagree with many of the conclusions reached by the majority in arriving at the ultimate conclusion that the Board action must be sustained.

I agree with the majority opinion that the bark burner installed by appellee *"serves two basic purposes, or functions, in the paper manufacturing operation at Oxford Paper Company: it disposes of waste bark and it produces steam."*

It is with the reasoning which follows these conclusions that I cannot agree.

As the majority opinion points out, Oxford Paper Company (Ethyl's predecessor in title) had historically created huge quantities of bark in its paper producing process. Always heretofore, this bark had been hauled away and used as landfill in the Rumford-Mexico area. Again, as the majority opinion recognizes, this bark ultimately disintegrates and, in the disintegration process, creates water pollution because

"decaying organic material is discharged, or 'leached' into nearby streams. As a result, the acid level of the streams increases, their oxygen content decreases, and fungi and slime accumulate in the water. In addition, the decomposing bark gives off acetic acid gases which are the cause of offensive odors in the vicinity of land fill sites."

There is no gainsaying that air and water pollution have reached alarming proportions. Without exception, each of our states in the United States has taken steps to abate pollution.

At least thirty-one states use tax relief as an incentive for the installation of industrial pollution abatement facilities.

Maine is one.

Although the use of tax incentives for the purpose has been criticized [*see* Ohio St.L.J. 860 (1972)], our Legislature in its wisdom has utilized tax incentives as an appropriate and effective means of encouraging pollution abatement by industry.

In the past, Oxford Paper Company has occasioned substantial pollution of both air and water in its production of paper. Waste bark has, by the simple and natural

4. The Board argues, here, that the enactment of 1 M.R.S.A. § 404–A (effective October 3, 1973), cited by the majority at n. 11, will resolve future problems similar to that before us by requiring factual findings and reasons of the administrative agency.

This argument is not persuasive. *Maine Motor Rate Bureau* itself demonstrates that to require findings and reasons does not ensure adequate administrative statements. In fact, in the leading cases ordering remand for administrative clarification the reviewing court has had the benefit of some findings and reasons. *Se-*

*curities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942); *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). *See also: Northeast Airlines, Inc. v. Civil Aeronautics Board*, 331 F.2d 579 (1st Cir. 1964); Friendly, the *"Limited Office"* of the *Chenery* Decision, 21 Adm.L.Rev. 1 (1968). The impact of 1 M.R.S.A. § 404–A, if complied with, will often be to substitute inadequate findings and reasons for none at all. *Northeast Airlines, Inc., supra.*

process of decomposition, created pollution of both water and air. The waters into which acid is discharged or *"leached"* have increased their acid level alarmingly. The hydrogen-ion concentration, or pH, is substantially below tolerable levels in the waters surrounding the area where the bark was deposited as landfill. By putting the bark burner into operation, there can no longer be any acetic acid created by future operations of Ethyl's Oxford Paper Company mill nor any decaying organic material *"leached"* into streams, thus increasing the acid level of such streams and decreasing the oxygen content of such waters.

In my view, Ethyl has demonstrated it has assembled a facility, qualifying for a certificate of tax exception from the Board of Environmental Protection, if the basic and primary function of the facility, i. e., the bark burner, was to abate water pollution. *Statler Industries, Inc. v. Board of Environmental Protection,* Me., 333 A.2d 703 (1975).

As I see it, a water pollution control facility is not limited to machinery which will take industrial waste which is already mixed with the water so as to become a part of it and remove it from the water.[5]

The key to the majority opinion's conclusion that Ethyl is not entitled to a certificate of tax exemption is found in that portion of the opinion which reads as follows:

"Bark itself is merely a 'substance *capable* of polluting the waters of the State', § 1760(29)(C) (emphasis added). Whether bark in fact causes water pollution is entirely dependent on what is done with it *after* it has been separated from the logs. Used as a landfill, for example, bark is a demonstrable source of water pollution.

"Section 1760(29)(B), as we have interpreted it, specifically requires that a facility be utilized 'primarily for the purpose of reducing, controlling or eliminating *water pollution caused by industrial waste*' (emphasis added), as distinguished from 'industrial waste' itself. The goal

at which the statute is directed is not the abatement of 'industrial waste,' but the abatement of *'water pollution.'* "

With all due respect to the reasoning of my colleagues, I think the simple answer to this latter statement is that it is clearly demonstrated that future *water pollution* is eliminated by the burning of industrial waste, i. e., bark.

The majority opinion continues:

"The boiler in no way abates the extensive water pollution which has been created by the piles of bark that Ethyl has dumped throughout the Rumford-Mexico area over the years. That pollution will persist, in Ethyl's estimation, for a period of at least twenty years."

I find nothing in the legislation which permits a conclusion that the certificate may properly be issued only when it is found that the facility is used for the primary purpose of cleaning up a polluting agent in the water *which was created many years before.* The existence of the bark in the Rumford-Mexico area which was used as landfill many years ago has no bearing, it seems to me, on whether or not Ethyl is entitled to the issuance of the certificate if the Board, on remand, finds that at great expense Ethyl has installed and is utilizing equipment operated primarily for the purpose of eliminating water pollution which would be caused by industrial waste, i. e., bark, in the future if not disposed of by the bark burner.

The Legislature, by creating the Board of Environmental Protection, established an agency which it intended should develop an expertise in resolving the special problems with which it is by law required to become concerned. To adopt a hypothesis, as the majority opinion does, (which hypothesis is in my opinion not correct) and thereby supply the reasoning which the Board might have used (though there is clearly nothing to indicate they *did* use such reasoning, or would want to), is to effectively bypass the important expert analysis of the Board which was intended by the statute.

---

**5.** I find it very difficult to imagine any facility which would qualify for a tax exemption certif-

icate if such interpretation or legislative intention is correct.

A bypass in this case ought not to be countenanced.

I would remand the case to the Superior Court with instructions to remand to the Board of Environmental Protection with specific instructions to reconsider the application and make specific findings of fact and conclusions of law thereon.